No. 55,796

IRL SHUTTS and ROBERT ANDERSON and BETTY ANDERSON, Individually and as representatives of all producers and royalty owners to whom Phillips Petroleum Company made payment of suspended proceeds of royalties pursuant to Federal Power Commission Opinion Nos. 669, 669H, 749, 749C, 770 and 770A, *Appellees,* v. PHILLIPS PETROLEUM COMPANY, *Appellant.*

(679 P.2d 1159)

196

Opinion filed March 24, 1984.

*Joseph W. Kennedy,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Robert W. Coykendall,* of the same firm, *James R. Yoxall,* of Light, Yoxall, Antrim & Richardson, of Liberal, and *T. L. Cubbage, II,* of Phillips Petroleum Company, of Bartlesville, Oklahoma, were with him on the briefs for the appellant.

*W. Luke Chapin,* of Chapin, Penny & Goering, of Medicine Lodge, argued the cause, and *Ed Moore,* of Ginder & Moore, of Cherokee, Oklahoma, and *Harold K. Greenleaf,* of Smith, Greenleaf & Brooks, of Liberal, were with him on the brief for the appellees.

*Gerald Sawatzky* and *Jim H. Goering,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita; were on the brief for the *amicus curiae,* Sun Oil Company.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is a class action suit brought against Phillips Petroleum Company (Phillips) by Irl Shutts, Robert Anderson and Betty Anderson, individually and on behalf of 28,100 royalty owners, including those who are not residents of Kansas, for recovery of interest on "suspense royalties" on gas produced from leases in eleven states. These royalties were withheld by Phillips at various times from July 1974 to February 1978 under three Federal Power Commission (FPC) opinions pertaining to gas rates in nationwide gas rate proceedings, and later paid by Phillips to the royalty owners without interest. The trial court determined (1) the class consisted of all royalty owners and overriding royalty owners who received suspense royalties from Phillips, whether or not they were residents of Kansas, (2) Phillips was liable for interest on all royalties and overriding

royalties retained by it under the FPC opinions, and (3) the applicable rate of interest owed on the suspended royalty payments. Phillips challenges these findings on appeal. The plaintiff class has cross-appealed contending the trial court incorrectly determined the applicable rate of interest.

With a few exceptions this case is similar in legal issues and factual situation to that presented in *Shutts, Executor v. Phillips Petroleum Co.*, 222 Kan. 527, 567 P.2d 1292 (1977), *cert. denied* 434 U.S. 1068 (1978) (hereinafter referred to as *"Shutts I"*). The following relevant facts were stipulated to by the parties in the pretrial order and later adopted by the trial court as part of its findings of fact in its journal entry of judgment. This action was filed in July 1979, by Irl Shutts, a resident of Kansas, and Robert Anderson and Betty Anderson, residents of Oklahoma. Shutts is the owner of royalty interests under five leases owned by Phillips in Texas and Oklahoma. The Andersons are owners of gas royalty interests under a lease owned by Phillips in Oklahoma.

Notice was given to 33,000 potential class members by first-class mail. Approximately 3,400 class members elected to opt out of the class and notice could not be delivered to approximately 1,500 other potential class members, thereby reducing the size of the class to approximately 28,100 members. No notice by publication was used in this case.

Beginning with FPC Opinion No. 699 the Federal Power Commission began rate making on a nationwide, rather than areawide, basis as had been done previously. Payments of gas royalties were suspended in part by Phillips under FPC Opinion No. 699 from July 1974 through July 1976; under FPC Opinion No. 749 from January 1976 through February 1978; and under FPC Opinion No. 770 from August 1976 through July 1977. Notices of the suspended payments were sent to royalty owners on various dates during the suspension periods. Following final approval of price increases, royalties were paid to the royalty owners in the approximate amounts of $3,700,000 under Opinion No. 699; $2,900,000 under Opinion No. 749; and $4,700,000 under Opinion No. 770.

Increased prices for gas sales were collected by Phillips during the suspension periods subject to a duty to refund to the purchasers in the event the ordered price increases were not approved. Through all or part of the periods of suspension

Phillips withheld the royalty payments attributable to the price increases in Opinion Nos. 699, 749 and 770, unless the royalty owners put up an acceptable indemnity to repay the increased portion of the royalty *with interest* if the price increases were not approved.

On termination of the suspension periods Phillips resumed payments of royalties based on the increased prices to all of its royalty and overriding royalty owners to whom it accounted. Phillips also paid the royalty and overriding royalty owners the increased royalties due them which had been suspended under the three FPC opinions. *Phillips neither paid nor offered to pay interest on the royalties which had been suspended under the FPC orders.*

The following chart indicates the number of leases located in Kansas and number of Kansas royalty owners, in relation to the total number of leases and royalty owners, affected by the three FPC opinions:

| OPINION NUMBER: | 699 | 749 | 770 |
|---|---|---|---|
| Number Leases Affected | 7,389 | 6,109 | 6,232 |
| Number Leases in Kansas | 3 | 15 | 4 |
| Royalties Paid on Kansas Leases | $ 152.88 | $ 2,619.24 | $ 115.10 |
| Total Royalties Paid | $3,696,274.97 | $2,873,827.18 | $4,744,024.10 |
| Total Number Royalty Owners Affected | 22,328 | 20,566 | 19,298 |
| Number of Kansas Royalty Owners | 496 | 533 | 504 |
| Royalties Paid to Kansas Royalty Owners | $ 9,281.75 | $ 37,818.00 | $ 75,538.68 |

The largest number of leases affected under all three opinions are located in Texas and Oklahoma. Royalty owners who were paid suspense royalties under the FPC opinions are domiciled in the 50 states, the District of Columbia, the Virgin Islands, and several foreign countries. Further facts will be developed as necessary to discuss the issues raised on appeal.

Phillips first contends the trial court erred in certifying a nationwide class because (1) the court's exercise of jurisdiction over nonresident plaintiffs is not in accord with recent decisions of the United States Supreme Court and is prohibited by the due process clause, and (2) sufficient affiliating circumstances do not exist between the plaintiff class and forum to satisfy the requirement set forth in *Shutts I* that the forum have a legitimate interest in adjudicating the common claims of the plaintiff class. Following a hearing on the motion to certify the class the trial court determined, in pertinent part:

"2. The claims of plaintiffs are typical of the claims of all the members of the class except that each owner may be entitled to a different amount of interest and the interest to each owner, if allowed, would be too small to enable each to file a separate action.

"3. The only questions of law and fact in this case are common to the entire proposed class, in that the sole issue appears to be whether defendant is liable for interest on the money received by it from purchasers of gas pursuant to opinions No. 699, 749 and 770 of the Federal Power Commission and withheld by defendant for a period from December 30, 1975, to July 1, 1980.

"4. This action should be certified as a class action and the plaintiff class is defined as follows:

'All royalty owners and overriding royalty owners to whom Phillips Petroleum Company made suspense royalty payments between December 30, 1975, and July 1, 1980, relating to Federal Power Commissions Opinions 699, 749 and 770 (which includes 699H, 749C and 770A).'

"5. Notice of the pendency of this action, its nature and effects of any judgment shall be given to all members of the class. . . . The defendant shall provide to the plaintiffs a list of all members of the class and their mailing addresses as shown by defendant's records."

A petition for writ of mandamus to direct the district judge to decertify the class as to all unnamed nonresident plaintiff class members was denied by this court in *Phillips Petroleum Co. v. Duckworth,* Case No. 54,608, June 28, 1982. A petition for *certiorari* from the denial of mandamus was denied by the United States Supreme Court, _____ U.S. _____, 74 L.Ed.2d 951, 103 S.Ct. 725 (1983).

In *Shutts I* this court extensively discussed the issue of whether a Kansas court may assert jurisdiction in a plaintiff class action over nonresident plaintiff class members who have no "minimum contacts" with the State. The class action filed in *Shutts I* sought to recover interest on suspense royalties attributable to gas produced from leases in the three-state Hugoton-Anadarko area. The plaintiff, a Kansas resident, was the repre-

sentative of a class of 6,400 gas royalty owners, only 218 of which were residents of Kansas. While the record did not reflect the number in the plaintiff class residing in other states which held gas leases covering land in Kansas, the largest physical portion of the Hugoton-Anadarko area was situated in Kansas. 222 Kan. at 537.

In *Shutts I* the court rejected Phillips' contention that the trial court did not have jurisdiction over in personam claims of unnamed nonresident class plaintiffs having no contact with Kansas. In so doing the court first examined the "minimum contacts" requirement established in *Internat. Shoe Co. v. Washington,* 326 U.S. 310, 90 L.Ed. 95, 66 S.Ct. 154 (1945), and its progeny, for exercising in personam jurisdiction by a state over a nonresident *defendant.* The court held the "minimum contacts" test is inapplicable to nonresident *plaintiffs* in a class action, reasoning:

"Whether all *nonresident plaintiffs* in a class action are required to have 'minimum contacts' with the forum is a different matter. Because a class action must necessarily proceed in the absence of almost every class member, we hold the residential makeup of the class membership is not controlling. (Note, Consumer Class Actions with a Multistate Class: A Problem of Jurisdiction, [25 Hastings L. J. 1411] 1432 [1974].) What is important is that the nonresident plaintiffs *be given notice and an opportunity to be heard and that their rights be justly protected by adequate representation.* These are the essential requirements of due process, and they must be satisfied in any class action by every court, state or federal, regardless of the residence of the absent class members. Therefore, while the essential element necessary to establish jurisdiction over nonresident defendants is some 'minimum contacts' between the defendant and the forum state, *the element necessary to the exercise of jurisdiction over nonresident plaintiff class members is procedural due process.*" (Emphasis in original.) 222 Kan. at 542-43.

The court discussed the restrictions on access to the federal courts in class action suits, 222 Kan. at 544-45, and cited numerous cases and other authorities which support the view that a state court has the power to bind a nonresident plaintiff class member. 222 Kan. at 543, 547-49. In addition, the court found the case to be "closely analogous" to cases recognizing a class action may be binding on nonresident plaintiffs when a "common fund" is involved and where due process requirements are met. 222 Kan. at 552. In *Shutts I,* as here, Phillips commingled the suspense royalties with its other funds which it used to fulfill all its business obligations, rather than maintaining a separate fund.

Phillips first contends the holding in *Shutts I,* that a state court can exercise jurisdiction over unnamed nonresident class plaintiffs where procedural due process is satisfied, is not in accord with two recent decisions of the United States Supreme Court and should therefore be overruled. See *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92, 62 L.Ed.2d 490, 100 S.Ct. 559 (1980); *Rush v. Savchuk,* 444 U.S. 320, 327, 62 L.Ed.2d 516, 100 S.Ct. 571 (1980). *Woodson* involved the exercise of in personam jurisdiction by a state court over a nonresident *defendant* in a products liability action whereas *Rush* involved the exercise of *quasi in rem* jurisdiction over a nonresident *defendant* in a tort action. Both cases merely reiterate the due process considerations and minimum contacts test set forth in *Internat. Shoe Co. v. Washington,* 326 U.S. at 316, and subsequent cases.

As was the case in *Shutts I,* these cases deal with nonresident *defendants,* not nonresident *plaintiffs.* These cases rely entirely upon discussions of due process contained in *Internat. Shoe; Hanson v. Denckla,* 357 U.S. 235, 2 L.Ed.2d 1283, 78 S.Ct. 1228 (1958); and *Shaffer v. Heitner,* 433 U.S. 186, 53 L.Ed.2d 683, 97 S.Ct. 2569 (1977), all of which were fully reviewed in *Shutts I.* 222 Kan. at 541-42. No new concepts of due process are presented in *Woodson* or *Rush* which were not considered in *Shutts I* and which would warrant a reversal or modification of the opinion in that case.

The decision of this court in *Shutts I* has been widely cited by other courts in recognizing that where procedural due process guarantees of notice and adequate representation are present state courts are empowered to entertain multistate plaintiff class actions and to issue judgments binding on nonresident class members. See *Miner v. Gillette Co.,* 87 Ill. 2d 7, 12-13, 428 N.E.2d 478 (1981); *In re No. Dist. of Cal. "Dalkon Shield" IUD Products,* 526 F. Supp. 887, 906, n. 79 (N.D. Calif. 1981), *vacated and remanded* 693 F.2d 847 (1982); *Schlosser v. Allis-Chalmers Corp.,* 86 Wis. 2d 226, 241-42, 271 N.W.2d 879 (1978); *Katz v. NVF Co.,* 119 Misc. 2d 48, 51, 462 N.Y.S. 2d 975 (1983). See also *Geller v. Tabas,* 462 A.2d 1078, 1083 (Del. 1983). Most authorities are in apparent agreement that due to the representative character of plaintiff and defendant class actions, procedural due process standards govern the power of state courts to bind absent class members. See Restatement (Second) of Judgments § 41

(1982); 3B Moore's Federal Practice ¶ 23.11[5], p. 23-2893 (1983); Newberg on Class Actions § 1206 *et seq.* (1980 Supp.). In Newberg on Class Actions § 1206a, the author comments:

"Under settled principles of due process, state courts have personal jurisdiction over defendants residing within the territorial limits of the state, and also over nonresident defendants but only when the defendant has some minimal connection to the forum. Multistate class actions, however, fall in a different category from those to which these traditional notions of personal jurisdictional limits of state courts over defendants apply. Tests of territorial jurisdictional limits or minimum contacts with the forum are inapplicable and need not be satisfied in order for a state court to issue a judgment, *e.g.* in a plaintiff's class action, which is binding on nonresident members of the class."

Phillips argues the decision in *Shutts I* "ignores the balance between the courts of coequal sovereign states inherent in the federal constitution and recognized by the United States Supreme Court." The appellant refers to the language in *Woodson,* 444 U.S. at 292, that the concept of minimum contacts "acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." One commentator agrees that the issue of jurisdiction asserted by state courts in multistate plaintiff class actions must be viewed in the context of our federal system. See Note, Multistate Plaintiff Class Actions: Jurisdiction and Certification, 92 Har. L. Rev. 718, 729, 733 (1979). However, as we noted in *Shutts I,* recent United States Supreme Court cases restricting access to the federal courts in class action suits have made it necessary for state courts to hear nationwide class actions:

"Recently the United States Supreme Court has required plaintiffs to assume the cost of notice in common-question class actions. (*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 40 L.Ed.2d 732, 94 S.Ct. 2140.) The United States Supreme Court has also refused to aggregate class action claims to meet the $10,000 federal jurisdictional requirements. (*Zahn v. International Paper Co.,* 414 U.S. 291, 38 L.Ed.2d 511, 94 S.Ct. 505; and *Snyder v. Harris,* 394 U.S. 332, 22 L.Ed.2d 319, 89 S.Ct. 1053, reh. denied 394 U.S. 1025, 23 L.Ed.2d 50, 89 S.Ct. 1622.) While the results are supported by the fear of overloading the federal judicial system and the desire not to judicially expand the constitutionally established jurisdictional limits, these recent United States Supreme Court cases have clearly restricted access to federal courts. This suit, for example, could not be brought in a federal court. Furthermore, the FPC does not have jurisdiction over the matter. If the state courts will not hear the matter, who will grant relief?

"If state courts cannot maintain class action suits with nonresident plaintiffs, can the 'small man' find legal redress in our modern society which increasingly

exposes people to group injuries for which they are individually unable to get adequate legal redress, either because they do not know enough or because such redress is disproportionately expensive? (See A. Homburger, State Class Actions and the Federal Rule, 71 Colum. L. Rev. 609, 641-643 [1971].)

"The appellant argues this action should be brought in several different state courts. This risks inconsistent adjudications for a class which is otherwise treated alike. Furthermore, the statute of limitations has run in Oklahoma and Texas. The United States Supreme Court has held the commencement of a class action suit tolls the applicable statute of limitations as to all members of the class. (*American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 38 L.Ed.2d 713, 94 S.Ct. 756, reh. denied 415 U.S. 952, 39 L.Ed.2d 568, 94 S.Ct. 1477; and *Eisen v. Carlisle & Jacquelin*, supra.) However, if in this action Kansas is without jurisdiction over class plaintiffs in other states, this action would not toll the statute of limitations in those states." 222 Kan. at 544-45.

See also Newberg on Class Actions § 1206c.

These comments are equally applicable to the instant lawsuit. Phillips argues this action should be brought in several different state courts. This is merely an effort to "divide and conquer" as a strategy to avoid liability to individual royalty owners. If state courts cannot entertain class action suits involving nonresident plaintiffs, the effectiveness of the class action machinery is destroyed. Furthermore, the statute of limitations has run in all other states where leases involved in this lawsuit are located. If the in personam claims of nonresident plaintiff class members are dismissed from this action, those persons would be barred from recovering on their claims elsewhere.

This decision does not usurp the authority of other states where leases involved in this lawsuit are located to regulate transactions within their borders as Phillips argues. To our knowledge, no claims for interest on suspense royalties withheld by Phillips under the FPC rulings involved here have been asserted in any other forums on behalf of either individual royalty owners or as a plaintiff class of royalty owners. In Newberg on Class Actions, § 1206d, the author discusses the use of statewide class actions in several states as an alternative to a nationwide class:

"Several statewide class actions, by definition, create a multiplicity of actions where formerly there was one. The waste of judicial resources in these circumstances is obvious, even assuming the doubtful proposition that plaintiffs and lawyers to represent them will be found who will initiate these state class actions in all affected states before the statute of limitations period has expired, and that all states with these suits have receptive class rules and will certify appropriate classes. The risk of inconsistent adjudications for a class which otherwise is

treated alike, swells with each new statewide class commenced. State courts which have certified multistate classes have generally recognized the unsuitability of requiring a class action to be brought in several different state courts.

"Finally, exclusion of non-residents from the class solely on the ground of their non-residency may be an unconstitutional discrimination against non-residents with respect to access to this state's courts, in violation of the Privileges & Immunities Clause of the United States Constitution. Each state court system, while possessing its own jurisdiction, is nevertheless part of a larger network of courts of the several states."

See also 3B Moore's Federal Practice ¶ 23.35.

Phillips argues that jurisdiction over the nonresident plaintiffs cannot be based on their receiving notice of a class action and failure to opt out of the action, because a state cannot compel a nonresident to take affirmative action to avoid its jurisdiction. This same "bootstrap" argument was rejected by the Court in *Shutts I*:

"Phillips argues our notice statute which allows a party to 'opt-out' of a class action suit cannot be used to 'bootstrap' jurisdiction of the court. Suffice it to say the federal rules and our rule regarding class actions are the result of a conscious choice to decide between provisions allowing parties to 'opt-out' or 'opt-in.' A determination was made to follow the 'opt-out' procedure to bind the greatest number of people. (See Proposed Rules of Civil Procedure, 39 F.R.D. 69, 105 [1966]; Cohn, The New Federal Rules of Civil Procedure, 54 Geo. L.J. 1204, 1226 [1966]; and Staff Studies Prepared for the National Institute for Consumer Justice on Consumer Class Action, pp. 138, 149 [1972].)

"Phillips argues our class action statute does not give the putative class member an absolute right to 'opt-out' as does Federal Rule No. 23(c)(2)(A). K.S.A. 60-223(c)(2) provides in pertinent part:

" '. . . [T]he court shall exclude those members who, *by date to be specified,* request exclusion, unless the court finds that their inclusion is essential to the fair and efficient adjudication of the controversy and states its reasons therefor. . . .' (Emphasis added.)

"Phillips argues by removing the choice of the putative class member to 'opt-out' of the class, it was the intent of the rule to apply to persons over whom the court already had jurisdiction. We do not think such a convoluted conclusion logically follows. The language simply gives the court the power to deny exclusion to class members, be they residents or nonresidents of Kansas, whose inclusion is essential to the fair and efficient adjudication of the controversy. However, we need not examine this section in great detail. (See Staff Studies Prepared for the National Institute for Consumer Justice on Consumer Class Action, *supra* at 145-146.)." 222 Kan. at 555.

We must next determine whether the procedural due process guarantees of reasonable notice and adequate representation were met. Phillips maintained records in their computer system

of the names and addresses of all royalty owners affected by FPC Opinions Nos. 699, 749 and 770, and the amount of additional royalties paid to each. Pressure-sensitive mailing labels provided by Phillips, listing the known names and addresses of the approximately 33,000 royalty owners, were used by the plaintiffs to send notice of the class action to the potential class members by first class mail. The notices contained a request for exclusion which could be used by the royalty owners to opt out of the class. No notice by publication was used. Those royalty owners who opted out of the class and to whom notice could not be delivered were excluded from the class. Therefore, all royalty owners included in the class received notice and chose to remain in the class. Reasonable notice was given which fully complied with K.S.A. 60-223 and Fed. R. Civ. Proc. 23. The notice satisfied jurisdictional and constitutional due process requirements.

In examining whether adequate representation was accorded the absent resident and nonresident plaintiffs by the named representatives, we are mindful of the following discussion in *Shutts I*:

"Where inadequate representation is established, courts have denied *res judicata* effect to class action judgments. (See *Research Corp. v. Pfister Associated Growers, Inc.*, 301 F. Supp. 497 [N.D. Ill. 1969]; and *Gonzales v. Cassidy*, 474 F.2d 67 [5th Cir. 1973].)

"The class action is premised on the theory that members of the class who are not before the court can justly be bound because the self-interest of their representative coincides with the interest of the members of the class and will assure adequate litigation of the common issues. Where the interests of absent class members have not been adequately represented, binding them by the class judgment would seem to offend the requirements of due process. (*Hansberry v. Lee*, [311 U.S. 32, 85 L.Ed. 22, 61 S.Ct. 115 (1940)].) Notice to absent members of the class in this regard is particularly important, for it is the greatest single safeguard against inadequate representation. (*Mullane v. Central Hanover Tr. Co.*, [339 U.S. 306, 314, 94 L.Ed. 865, 70 S.Ct. 652 (1950)].)" 222 Kan. at 556.

In 7 Wright & Miller, Federal Practice and Procedure: Civil § 1765, p. 618 (1972), the author states:

"In most contexts, notice of the action is the touchstone that satisfies due process; the notice must be sufficient to give the party an opportunity to appear and join in the lawsuit or to challenge the claims of representation . . . . Thus a number of courts have held that the crucial determinant of due process is not notice but whether the putative class plaintiff or plaintiffs will fairly and adequately protect the interests of those whom they claim to represent."

What constitutes adequate representation is a question of fact to be determined by the trial court based upon the circumstances of each case. The decision should not be disturbed on appeal absent a showing of an abuse of discretion. 7 Wright & Miller, Federal Practice & Procedure: Civil § 1765; 3B Moore's Federal Practice ¶ 23.07[1], *Helmley v. Ashland Oil, Inc.,* 1 Kan. App. 2d 532, 535, 571 P.2d 345, *rev. denied* 222 Kan. 749 (1977). Moreover, the law does not require that a named plaintiff be the perfect class member or even the best available. In determining the adequacy of the representative the trial court should consider: (1) whether there is adequate competent counsel; (2) whether the litigants are involved in a collusive suit; (3) whether the interests of the named parties are conflicting with or are antagonistic in any way to the interests of the other members of the class; (4) whether the named representatives' interests are coextensive with the interests of the other members of the class; (5) the quality of the named representatives, not the quantity; and (6) the extent of the named representatives' interests in the suit's outcome. See 7 Wright & Miller, Federal Practice & Procedure: Civil §§ 1765-1769; 3B Moore's Federal Practice, ¶¶ 23.07[1]-23.07[4]; *Helmley v. Ashland Oil, Inc.,* 1 Kan. App. 2d at 535; *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562-63 (2d Cir. 1968); *Miner v. Gillette Co.,* 87 Ill. 2d at 14.

Considering these factors it is clear the class members were competently and adequately represented by the named representatives and their attorneys. The same attorney who was recognized in *Shutts I* as having done a "superior job in bringing this action and in arguing and briefing the law on this appeal" (222 Kan. at 557) represents the named representatives in the instant action. Counsel is said to be qualified to act for the representatives of the class, and therefore the class itself, if he is experienced in the particular type of litigation before the court. 7 Wright & Miller, Federal Practice and Procedure: Civil § 1766, p. 634. There is nothing in the record to suggest the class is not being competently represented by its counsel in this action, nor that the parties are involved in a collusive suit.

The named representatives and class members have identical interests in the lawsuit. Before the named representatives' status can be defeated the defendant must show a conflict exists between the representatives and class members which goes to the

very subject matter of the litigation. *Helmley v. Ashland Oil, Inc.,* 1 Kan. App. 2d at 536, and cases cited therein. Recovery for interest on the suspense royalties, which both the named representatives and the class members seek, is the heart of this action. No conflicting or antagonistic interests exist between the representatives and class members.

The coextensiveness factor requires only that the representatives and class members "share common objectives and legal or factual positions." 7 Wright & Miller, Federal Practice and Procedure: Civil § 1769, p. 655; *Helmley v. Ashland Oil, Inc.,* 1 Kan. App. 2d at 536. The fact that a defense may be asserted against the named representatives, as well as some other class members, but not the class as a whole, does not destroy the representatives' status. Here, a coextensiveness of interests exists between the representatives and class members to recover interest which is due them on suspense royalties withheld by Phillips.

The various authorities agree that whether the class members are adequately represented by the named plaintiffs depends on the quality of the representation, rather than the number of representative parties as compared with the total membership of the class. 7 Wright & Miller, Federal Practice & Procedure: Civil § 1766; 3B Moore's Federal Practice ¶ 23.07[4]; *Eisen v. Carlisle & Jacquelin,* 391 F.2d at 562-63. The use of a percentage test to determine whether absent parties will be fairly represented often would work to defeat the purpose of the class action device: to enable litigants with small claims to vindicate their rights. 7 Wright & Miller, Federal Practice & Procedure: Civil § 1766; *Eisen v. Carlisle & Jacquelin,* 391 F.2d at 563. Similarly, the size of the representatives' personal claims should not be dispositive of the question whether the class is adequately represented, since requiring the class representatives to have a large interest in the dispute would thwart one of the basic purposes of such action. 7 Wright & Miller, Federal Practice & Procedure: Civil § 1767; 3B Moore's Federal Practice ¶ 23.07[4]. The quality of representation embraces both the competence of the legal counsel of the representatives and the stature and interest of the named parties themselves. Generally the representatives must be of such a character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be

protected. 7 Wright & Miller, Federal Practice & Procedure: Civil § 1766.

It is true the individual interests of the three named representatives are small when compared with the claims of the class as a whole. However, the representatives have sufficiently demonstrated a willingness to pursue this action to assure the class members' rights will be protected. As the named representative in *Shutts I*, Irl Shutts has more than shown his ability to adequately represent the class as a whole and prosecute the action through the entire judicial process to ensure the class members' claims are vindicated. There is nothing to indicate this action would not be pursued as vigorously as the action involved in *Shutts I*.

Based on the foregoing discussions, we find the procedural due process guarantees of reasonable notice and adequate representation were afforded the absent nonresident plaintiff class members.

Phillips contends the instant action should be dismissed because Kansas does not have a "legitimate interest" in entertaining this action. Phillips focuses on the following caveat expressed in *Shutts I*:

"[T]his opinion should not be read as an invitation to file nationwide class action suits in Kansas and overburden our court system. Concepts of manageability in terms of our Kansas class action statute, the nature of the controversy and the relief sought, the interest of Kansas in having the matter determined, and the class size and complexity will have to be applied." 222 Kan. at 557.

Applying these factors, the court stated:

"Kansas has a legitimate interest in adjudicating the common issue herein because Kansas comprises the largest physical area included in the FPC designated Hugoton-Anadarko area where Phillips is doing business and producing gas which it sells in interstate commerce. All of the gas royalty owners in the Hugoton-Anadarko area have leases with Phillips and a common interest in the money collected by Phillips as 'suspense royalties' from the sale of gas in the designated area. . . . All of the gas royalty owners in the Hugoton-Anadarko area have a right in common with each other, in the equivalent of a common fund, to claim damages for commingling and use of the 'suspense royalties' by Phillips, payable as interest, and they have a contact with Kansas by reason of such common interest." 222 Kan. at 357-58.

Phillips argues that because such a small percentage of the total number of leases involved are located in Kansas, and only a small percentage of the royalty owners affected are residents of

Kansas, no "affiliating circumstances" exist which provide Kansas with a legitimate interest in entertaining this action. The factor emphasized in *Shutts I*, that Kansas comprised the largest portion of the areas affected by the FPC orders, is not present here.

Phillips likens the instant action to *Feldman v. Bates Manufacturing Co.*, 143 N.J. Super. 84, 362 A.2d 1177 (1976), which the court in *Shutts I* found presented an "excellent example" of a "*factual situation* in which a trial judge applying our class action statute should deny certification of a class action, where nonresident plaintiff class members are involved." 222 Kan. at 557. However, the present action, like *Shutts I*, is readily distinguishable from the situation presented in *Feldman*. In *Feldman* a resident of New Jersey brought an action against a Delaware corporation to compel the corporation to convert preferred stock to common stock. Addressing the issue of jurisdiction by the New Jersey court over the class action, the *Feldman* court indicated that without "affiliating circumstances" between *the forum and litigation*, such as a "common trust fund," the judgment in a plaintiff class suit could not bind the nonresident class members. In dismissing the lawsuit for lack of jurisdiction, the court emphasized that the defendant was a Delaware corporation, the defendant was not authorized to do business and had no assets in New Jersey, no "common fund" existed within the state in which the nonresident plaintiff class members had an interest, the nonresident plaintiff class members had no other contacts with the forum, and New Jersey had no special interest in supervising the conduct of the defendant corporation's business which would justify assuming jurisdiction. The fact that only 31 of the 295 class members were residents of New Jersey was not specified by the *Feldman* court as being a significant factor in the decision. The court did emphasize that Delaware, the defendant's domiciliary state, was fully capable of providing a uniform determination of the issues involved. In the case at bar, Phillips, an Oklahoma corporation, conducts business and holds assets in Kansas. The State of Kansas has an interest in supervising the conduct of Phillips' business in this state, and therefore affiliating circumstances exist between the forum and the litigation not present in *Feldman*, which justifies the assertion of jurisdiction by this court over the instant action.

When considering the manageability of class actions filed in our state courts, courts should give equal consideration to all of the factors set forth in *Shutts I*. The interest of the forum in having the matter determined is of no greater significance than the other considerations. As in the prior *Shutts* case, the manageability of this class is demonstrated by the absence of basic issues of fact. The material facts have been stipulated by the parties and the names, addresses and suspense royalty amounts for each royalty owner are readily available in Phillips' records. All royalty owners, regardless of residency, particular lease provisions or royalty agreements, were given the same notices by Phillips and were treated uniformly when suspense royalties and interest were withheld. Although a larger class is involved than in *Shutts I,* the legal issues presented are substantially the same. While these issues are complex they were thoroughly reviewed in *Shutts I*, thereby providing the trial court in the present case with substantial guidelines pertaining to the law applicable to these issues. If anything, this case is more manageable than *Shutts I* because of the legal principles enunciated in that opinion. The nature of the controversy and relief sought are not unfamiliar in this state. Our appellate courts have reviewed numerous cases in recent years involving interest on suspense royalties. See *Nix v. Northern Natural Gas Producing Co.,* 222 Kan. 739, 567 P.2d 1322 (1977), *cert. denied* 434 U.S. 1067 (1978); *Sterling v. The Superior Oil Co.,* 222 Kan. 737, 567 P.2d 1325 (1977), *cert. denied* 434 U.S. 1067 (1978); *Maddox v. Gulf Oil Corporation,* 222 Kan. 733, 567 P.2d 1326 (1977), *cert. denied* 434 U.S. 1065 (1978); *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977); *Helmley v. Ashland Oil, Inc.,* 1 Kan. App. 2d 532; *Gray v. Amoco Production Company,* 1 Kan. App. 2d 338, 564 P.2d 579 (1977), *modified* 223 Kan. 441 (1978).

Finally, although only a few leases involved in the instant litigation are located in Kansas, hundreds of Kansas resident royalty owners were affected under the three FPC opinions. Many of these Kansas class plaintiffs received royalties from leases located in other states. While this may constitute only a small percentage of the total number of class members, this state has a significant interest in protecting the rights of these royalty owners both as individual residents of this state and as members

of this particular class of plaintiffs. Oil and gas production is a significant industry in this state. Kansas has an interest in ensuring that out-of-state oil and gas companies which do business within this state do not conduct themselves unlawfully or violate the rights of resident royalty owners to whom the company is responsible. This action involves the equivalent of a "common fund" because of the suspense royalties commingled and used by Phillips during the pendency of the FPC orders. All of the gas royalty owners involved in this action have the common right to claim damages involving this "common fund." Therefore, all of these royalty owners have a substantial contact with Kansas by reason of their interest in the common fund which is the subject matter of this lawsuit.

Phillips and *amicus* Sun Oil Company also. argue that the "commonality" requirement to K.S.A. 60-223(*a*) is not met in this case. Sun Oil Company points to the language in *Shutts I* that "[w]hen liability is to be determined according to varying and inconsistent state laws, the common question of law or fact prerequisite of K.S.A. 60-223(*a*)(2) will not be fulfilled," 222 Kan. at 557. The *amicus* brief contends "this action involves eleven states and a maze of different interest laws."

As we have heretofore noted, common questions of fact and law exist in this case. All of the parties are similarly situated and no basic questions of fact exist, as the material facts have been stipulated by the parties. The subject matter of the litigation is the plaintiff class members' claim for interest on the suspense royalties. The requirement of 60-223(*a*)(2) is couched in the disjunctive: common question of fact *or* law. It does not, therefore, require the presence of both a common question of fact *and* a common question of law. See *Miner v. Gillette Co.*, 87 Ill. 2d at 17; 3B Moore's Federal Practice ¶ 23.06-1; 7 Wright & Miller, Federal Practice & Procedure: Civil § 1763. It has further been recognized that where common questions of fact predominate and conflicting laws apply, the plaintiff class members may be divided into subclasses to which the appropriate laws may be applied. *Miner v. Gillette Co.*, 87 Ill. 2d at 17; 3B Moore's Federal Practice ¶ 23.45[2]; Newberg on Class Actions § 1206h.

Phillips next contends it is not liable for interest on suspense royalties attributable to gas used by Phillips rather than sold to a pipeline company. If the increased rates were disapproved by

the FPC, Phillips would not be required to make refunds to purchasers on gas used rather than sold, because no increased rate was actually collected on such gas. Phillips argues, therefore, additional royalties attributable to gas it consumed did not belong to royalty owners until the increased rates were approved by the FPC. Phillips maintains this case is distinguishable from *Shutts I* for this reason and therefore it does not owe interest on additional royalties for gas it used prior to the time the rate was approved.

Relying on *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, Syl. ¶ 12, the court in *Shutts I* awarded prejudgment interest to royalty owners whose suspense royalties had been retained and used by the defendant, Phillips Petroleum Company, during the pendency of the FPC rate approval process, based upon the principle that the doctrine of unjust enrichment prevents one from profiting or enriching himself at the expense of another contrary to equity. The court held:

"Where a party retains and makes actual use of money belonging to another, equitable principles require that it pay interest on the money so retained and used."

"In an action by royalty owners against their producer for interest on royalties held in 'suspense,' pending determination of lawful rates by the Federal Power Commission upon application of the producer for increased rates, it is held that interest on suspended royalties may be recovered for the period of time such royalties remained in the control of, and were available for use by, the gas producer during the pendency of FPC proceedings and related litigation regarding the determination of applicable lawful rates for gas sales, and litigation regarding the determination of issues involved in this appeal, all as more particularly set forth in the opinion." 222 Kan. 527, Syl. ¶¶ 20, 21.

As set forth more fully in the opinion, the court reasoned:

"In the case at bar, beginning on June 1, 1961, Phillips withheld the share of the class members of the increased gas prices subject to refund. Thereafter, while the FPC slowly ground out FPC Opinion No. 586, Phillips deposited the increased rate monies in its general accounts and commingled them with other funds without giving further notice to the royalty owners. *What is significant is these gas royalty suspense monies never did or could belong to Phillips.* If the FPC disapproved the proposed increased rates the pipeline companies (gas purchasers of Phillips) would receive this suspense money *and the interest which Phillips had agreed to pay by its corporate undertaking.* If the FPC approved the proposed increase rate, the 'suspense royalties' would go to the gas royalty owners.

. . . .

"[W]e do not believe that Phillips may enrich itself in the absence of any

contractual sanction or seize upon the procedural complexities of the FPC to avoid responsibility for an appropriate measure of damages, expressed in terms of interest. . . .

". . . Phillips expressly contracted to pay a percentage of the *price received* for the sale of gas on which month-by-month payments to the royalty owner were to be based. Although the money received by Phillips for the sale of gas in excess of the established rates pending FPC determination was subject to possible refund, *none of the excess was contractually excluded from the price received by Phillips and on which payment to the royalty owner was contractually based.* There was no rule or regulation which prohibited Phillips from including the excess in the amount on which calculation of payment to the royalty owner on a month-to-month basis was made. (*Stahl Petroleum Co. v. Phillips Petroleum Co.,* [550 S.W.2d 360 (Tex. Civ. App. 1977)].) But if Phillips chose to withhold payments of contractually owing 'suspense royalties' pending FPC approval, as authorized by prior federal case law, that did not relieve Phillips of its contractual obligation to pay the *price received* with interest for the period of time the suspense money was held and used by Phillips." (Emphasis in original.) 222 Kan. 559-62.

In its discussion the court pointed out that Phillips made substantial profit from the use of the suspense money during the period in question.

In the present case, as in *Shutts I,* Phillips filed a corporate agreement and undertaking with the FPC, pursuant to 18 C.F.R. § 154.102(c)(2) (1983), to refund, to Phillips' purchasers of gas, *with interest,* the portion of the increased rates not approved by the FPC. The rate of interest applicable under the corporate undertaking in the event of a refund is seven percent (7%) per annum prior to October 10, 1974, nine percent (9%) per annum thereafter until September 30, 1979, and thereafter at the average prime rate, compounded quarterly, as provided by 18 C.F.R. 154.67 (1983).

The trial court made the following ruling on this issue:

"Also, Phillips uses, in some instances, substantial portions of the gas produced in its own operations, and therefore, does not sell to a pipeline company.

"Phillips asserts that as a result of this, the pay adjustments do not necessarily belong to somebody else, but either belong to Phillips as a consumer, in the case of disapproval of the anticipated rate raises, or if approved, to the royalty owners.

"The difficulty with Phillips' position is that they assume, with their contractual or lessee obligations, that by using the gas themselves, they can avoid the obligation imposed under the original Shutts case.

"The court finds no basis to distinguish their obligations when they are their own consumer as a lessee, than when they are, as lessees in good faith, marketing the gas to pipelines or other consumers."

Phillips argues, in substance, that because it did not actually collect the increased price on the gas which it used rather than sold, it was not unjustly enriched by using money potentially belonging to the royalty owners. Phillips distinguishes this case from *Shutts I* because in that case the gas royalty suspense monies never did or could belong to Phillips, as they would either be passed along to the royalty owners if the increases were approved or refunded to the purchasers if disapproved. Here, if the increased rates were disapproved, Phillips would have no obligation to refund any amount to any purchaser on gas it used.

This argument is without merit for several reasons. Phillips acknowledges in its brief that its obligation to pay royalties under the various gas royalty agreements and casinghead gas contracts exists without regard to the actual disposition of the gas. The royalty is based on the volume of gas multiplied by the reference price which exists even if only one Mcf of gas is sold in the designated area. Royalties are paid on gas consumed by Phillips on the basis of prices received from the sale of other gas to a pipeline company. Therefore, whether the gas is consumed by Phillips or sold to a pipeline company, the amount of royalties paid to the royalty owners to whom Phillips accounts is based upon the actual price received by Phillips on the sale of gas as established by the FPC.

It is true that if the increased rates were not approved by the FPC Phillips would not be obligated to make any refunds to purchasers on the gas it used, since it had not sold such gas and did not receive an increased rate subject to refund. By consuming a portion of the gas received from its leasing operations, however, Phillips became, in effect, the purchaser of that gas. Where, as here, the increased rate is approved by the FPC, Phillips owed additional royalties to the royalty owners based on the increased rates for the period during which the royalties were suspended, *whether the gas was purchased by a pipeline company or consumed by Phillips.*

The retention of the suspense royalties by Phillips pending FPC determination was lawful. (See cases cited at 222 Kan. at 559.) Phillips, however, was not prohibited from paying royalties during the pendency of the FPC determination based on the increased rate on gas it either used or sold. These increased royalties would be subject to refund from future payment of

royalties if ultimately the increase was not approved. By choosing to withhold payment Phillips was allowed the use of the suspense monies during the suspension period which rightfully belonged to the royalty owners, and the royalty owners, in turn, were deprived of receiving and using those monies during that time. The trial court expressly found Phillips commingled the suspense monies with the other monies under its control and benefitted from the use of such monies by either investing it or using it as needed for day-to-day business operations. If Phillips had paid the royalty owners the increased rate on a month-to-month basis during the rate approval process, equity dictates it would be entitled to a refund with interest if those rates were disapproved, whether the gas was sold by Phillips to a pipeline company or used by Phillips in its operations. See *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 484 (Tex. 1978). Conversely, Phillips was not entitled to enrich itself "in the absence of any contractual sanction or seize upon the procedural complexities of the FPC to avoid responsibility for an appropriate measure of damages, expressed in terms of interest." 222 Kan. at 561.

Phillips contends that because it would not be obligated to refund increased prices to purchasers on gas it used where the increased rates were disapproved, this case falls within the rule of *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.*, 176 Kan. 433, 271 P.2d 773 (1954), which denied payment of interest on an amount due from a gas purchaser under an interim order of the Kansas Corporation Commission. In *Shutts I* this case was distinguished as follows:

"This answers Phillips' contention that *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.*, 176 Kan. 433, 271 P.2d 773, and other cases prevent the payment of interest on unliquidated sums. In *Columbian Fuel* an interim rate increase was approved by the Kansas Corporation Commission on natural gas sold to the buyer. The buyer was permitted to withhold the increase upon securing a bond. The seller brought suit seeking to collect interest on the amount withheld. This court noted the temporary nature of the Kansas Corporation Commission order and disallowed interest. The court held:

" 'In the absence of an agreement therefor interest may not be recovered on a claim as long as the validity of the claim is unadjudicated and the amount on which interest could be computed, if the claim be declared valid, remains wholly uncertain and unliquidated.' (Syl. 5.)

"Here, of course, an agreement for the payment of interest on the part of Phillips is clearly present. Further, the suspended payments in *Columbian Fuel*

did not necessarily belong to another. Here the 'suspense royalties' belong either to the royalty owners or the pipeline companies. Thus we reaffirm our decision in *Lightcap,* [221 Kan.] at 466, distinguishing *Columbian Fuel.*" 222 Kan. at 565.

The significant fact distinguishing *Columbian Fuel* from *Shutts I* is also present in this case: that an agreement for the payment of interest on the part of Phillips is clearly present. In addition, in *Columbian Fuel* essential undetermined factors existed, which is not true in the instant case. In that case the main undetermined issues were first, whether the buyer was liable for the cost of gathering and delivering the gas, and second, what was the cost, which involved the question of what factors to consider in determining such cost. Here there was no dispute that if the rate increases were approved by the FPC Phillips was liable to the royalty owners for the additional royalties based on the increased rate, and the amount due each royalty owner in that instance. As such it was not an unliquidated claim and interest could be easily computed.

Whether Phillips sells the gas at the increased price, actually receiving the increased amount, or uses it during the suspension period, it has the benefit of the lower price paid the royalty owners and is enriched by the use of the money until the increase is approved and the increased price is paid out as suspended royalties. Phillips is therefore obligated to pay interest on the additional royalties paid out whether the gas is sold or used.

Phillips next contends it is not liable for interest to some royalty owners under "without interest" and release clauses contained in casinghead gas contracts entered into with producers from which Phillips purchases gas. One provision permits Phillips to withhold, without interest, monies subject to FPC approval. It reads:

"The price per Mcf that Buyer [Phillips] receives under the 'Sales Contract' is, or may be, subject to regulation by the Federal Power Commission. The phrase 'price per Mcf that Buyer receives,' as used in this contract, shall mean only that portion of the price exclusive of any tax reimbursement then being collected by Buyer under the Sales Contract which is not subject to possible future refund by Buyer. If Buyer is later determined to be entitled to retain all or part of the amount collected subject to refund and is relieved from all further obligation to refund with respect thereto, Buyer shall retroactively recalculate the price payable hereunder and shall pay Seller the difference, *without interest,* between the amount previously paid Seller hereunder and the amount which would have

been payable based on the price which Buyer is so permitted to retain." (Emphasis added.)

The second clause purports to extinguish prior claims for money due for gas sold under prior contracts.

Under each of these contracts the producers warrant title to the gas purchased by Phillips. Under many of these contracts Phillips has assumed the producer's responsibility to distribute the royalties from the purchase price of the gas to the royalty owners at the direction of the producer. This provision states:

"For the account and on behalf of Seller, Buyer agrees to disburse such royalties, overriding royalties, bonus payments and production payments, as Seller shall from time to time direct, accruing from the production and sale of gas hereunder. Buyer shall deduct such payments from the amounts due Seller hereunder. Seller agrees to indemnify and hold Buyer harmless from loss and damages resulting from payments made pursuant to Seller's direction. Notwithstanding, Seller may elect initially to make all payments accruing from the production and sale of gas hereunder to the owners of all royalties, overriding royalties, bonus payments and production payments and to hold Buyer harmless therefrom in which event Buyer shall have no obligation with respect to disbursement of such payments as first above provided."

The trial court made the following findings of fact and conclusions of law relevant to this issue:

"Gas royalty agreements, casinghead gas purchase contracts, renewal contracts and division orders which purport in any way to relieve Phillips from the payment of interest on suspense royalties are not valid as far as royalty owners are concerned or binding on this court. The purported contracts between gas producers and Phillips should not be binding on the outside royalty owners where Phillips had use of the outside royalty owners' money and paid them no interest. (Shutts [222 Kan. at 530, Syl. ¶¶ 21, 22].) The outside royalty owners and the inside royalty owners are in the same class and Phillips owed them the same duties.

"As to the 'without interest' casinghead gas contracts, here again Phillips attempted by contract with the gas purchaser to eliminate its liability for interest. Such contracts are not binding on the outside gas royalty owners for the reasons above stated.

. . . . .

"Division orders, unitization agreements, gas royalty agreements, casinghead gas contracts, and any other type agreements which contain a 'no interest clause', whether as to 'inside' or 'outside' royalty owner are attempted unilateral agreements. They do not in any way alleviate the duty of Phillips to pay interest as above set forth. (Shutts [222 Kan. 527] and Maddox, [222 Kan. 733].)"

Phillips contends that based upon these contractual provisions no privity of contract exists between Phillips and the royalty

owners and Phillips is responsible only for money owed to the producer (seller) of the gas. Therefore where the contracts exclude the payment of interest to the producer or extinguish a producer's prior claims for money owed under prior contracts, no interest upon additional royalties is owed the royalty owners who are paid by Phillips on behalf of the purchasers.

These casinghead gas contract provisions are similar in many respects to division orders which attempt to unilaterally amend oil and gas leases to deprive the royalty owners of interest held in suspense. In *Maddox v. The Gulf Oil Corporation*, 222 Kan. 733, 567 P.2d 1326 (1977), *cert. denied* 434 U.S. 1065 (1978), the court defined a division order as "an instrument required by the purchaser of oil or gas in order that it may have a record showing to whom and in what proportions the purchase price is to be paid. Its execution is procured primarily to protect the purchaser in the matter of payment for the oil or gas, and may be considered a contract between the sellers on the one hand and the purchasers on the other." 222 Kan. at 735. The court held:

"It was the duty of Gulf under the lease contracts it had with its royalty owners to market the gas at the best prices obtainable at the place where the gas was produced. The insertion in the division orders of matters contrary to the oil and gas leases, or contrary to the law, cannot be unilaterally imposed upon the lessor by the lessee or the purchaser. Here the unilateral attempt by Gulf in the division orders to amend the oil and gas leases, and thereby deprive the royalty owners of interest to which they were otherwise entitled, was without consideration. Therefore, the provisions in the division order regarding waiver of interest are null and void as determined by the trial court." 222 Kan. at 735.

All of the royalty owners involved in this action are paid royalties directly by Phillips, whether under a regular gas royalty agreement between Phillips and the royalty owners or under a casinghead gas contract between Phillips and a producer where Phillips has agreed to assume the producer's duty to pay royalties directly to the royalty owner. As pointed out by Phillips in its brief, the usual pricing provision under the casinghead gas contract is based on the weighted average price received by Phillips in a price reference area from the sale of gas to a pipeline company as established by the FPC. This is the same royalty which would be paid to royalty owners under typical gas royalty agreements between Phillips and the royalty owners.

These casinghead gas contracts are not signed by the royalty owners nor is there evidence of any consideration given for the

withholding of additional royalties by Phillips without interest. These contracts are entered into between *Phillips and producers of gas.* Some of these contracts purport to waive any existing claim by the producers against Phillips and allow Phillips to withhold amounts *owed the producers* without interest. However, these provisions, entered into between Phillips and the producers, cannot unilaterally deprive royalty owners of interest which they would otherwise be entitled to receive under casinghead gas contracts in which the provisions do not appear. There is no evidence the producers or Phillips bargained with the royalty owners or gave any consideration for the relinquishment of the right to receive interest on additional royalties withheld by Phillips. These royalty owners were treated by Phillips the same as royalty owners to whom they account under regular gas royalty agreements. In the notices of the suspended payments sent by Phillips to *all* royalty owners, no distinction was made between royalty owners who receive royalties from Phillips under gas royalty agreements and those who receive royalties under casinghead gas contracts. All suspense monies were withheld and paid out to all royalty owners on a uniform basis. All royalty owners were notified of the right to receive the additional royalties during the suspension period if an acceptable indemnity was filed with Phillips. Phillips cannot deprive the royalty owners of their right to interest by entering into contracts with producers of gas purporting to waive the *producer's* right to receive interest. The provisions of the casinghead gas contracts cannot be read to waive the royalty owners' right to receive interest which they otherwise are entitled to where the contracts are not signed by the royalty owners and there is no consideration.

The appellant next contends this court should look to the law of each state where leases involved in this action are located and determine, based on conflict of law principles, whether interest is recoverable on royalties attributable to those leases and the applicable rate of interest under the laws of the states where each lease is located. In *Shutts I* the interest laws of Kansas, Oklahoma and Texas were held not to apply because the statutes referred to situations where there was no agreement as to the applicable rates of interest. Phillips expressly contracted and agreed to pay a stated interest to gas purchasers on the refunded

portions of the increased price, pursuant to the corporate under-taking filed with the FPC. This agreement was found to establish an appropriate measure of damages to be awarded the royalty owners, expressed in terms of interest, for the commingling and use of suspense monies by Phillips. 222 Kan. at 565.

The trial court held the rate of interest to be applied in the instant case, both prejudgment and postjudgment, was the stated rate under the corporate undertaking filed by Phillips with the FPC. The trial court did not determine whether any difference existed between the laws of Kansas and other states or whether another state's law should be applied. Phillips contends the failure to examine the substantive law of other states regarding the award of interest and applicable interest rates violates its constitutional rights.

In *Shutts I* it was held the rate of interest set forth in the corporate undertaking established an appropriate measure of damages to compensate the plaintiffs for the unjust enrichment derived by Phillips from the use of the plaintiffs' money. In the instant case Phillips has not satisfactorily established why this court should not apply the rule enunciated in *Shutts I* and instead look to the law of each state where leases are located to determine whether damages should be based upon a rate dif-ferent from that set forth in the FPC undertaking. The general rule is that the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred. 16 Am. Jur. 2d, Conflict of Laws § 5. Where a state court determines it has jurisdiction over a nation-wide class action and procedural due process guarantees of notice and adequate representation are present, we believe the law of the forum should be applied unless compelling reasons exist for applying a different law. All of the plaintiff class mem-bers in this lawsuit were given actual notice that this action was being brought on their behalf in Kansas. The plaintiffs had the opportunity to opt out of the lawsuit, but chose to have their claims litigated in the Kansas courts. We have hereinbefore held the unnamed plaintiff class members were adequately repre-sented in the lawsuit and that the forum has a significant legiti-mate interest in adjudicating the claims of the class members. The common fund nature of the lawsuit provides an excellent reason to apply a uniform measure of damages to the class as a

whole, as each member of the class has been similarly deprived of the rightful use of his or her money. The plaintiff class members have indicated their desire to have this action determined under the laws of Kansas. Compelling reasons do not exist to require this court to look to other state laws to determine the rights of the parties involved in this lawsuit.

Phillips next contends, based upon the "United States Rule" followed in *Shutts I,* that only unpaid principal is owing the plaintiffs and therefore they have no basis upon which to seek recovery for "interest." Addressing this issue, the trial court found:

"The position of Phillips that no interest is owed but only principal because the payments made must be first applied to interest under the U.S. Rule announced in *Shutts,* [222 Kan. 527], and therefore only principal is left owing, is without merit. The rules set forth in *Shutts,* [222 Kan. 527], allow a recovery under equitable considerations. Whether the recovery is for interest or principal is merely a strained construction of words. Plaintiffs are entitled to money for Phillips' use of their money, according to 18 CFR Section 154.67. The pleadings on file herein are conformed, if necessary, to meet the evidence presented."

This action is one for damages, expressed in terms of interest, to compensate the plaintiffs for the use of their money by Phillips. No attempt was made by Phillips to compensate the royalty owners for the period of time they were deprived of the rightful use of their money while Phillips benefitted from its use. It is irrelevant whether the plaintiffs' action to recover damages for unjust enrichment was expressed in terms of "damages," "interest" or "principal." Phillips was not misled as to the basis of the plaintiffs' claim by their action framed as one seeking recovery of interest.

Finally, Phillips suggests this court should exercise its supervisory authority and establish guidelines for the award of attorney fees in nationwide class action suits brought in Kansas. Phillips asserts presently the practice in Kansas is for the attorneys representing the class to receive a designated percentage of the amount of the judgment recovered by the class. The amount of attorney fees awarded, however, does not increase the defendant's liability and is taken from the judgment received by the plaintiff class. The district court ruled the amount of attorney fees would be determined following a hearing after the judgment became final. Regarding attorney fees the district court made the correct ruling.

The amount of attorney fees awarded should be within the sound discretion of the trial court based upon guidelines established by this court. In 3B Moore's Federal Practice ¶ 23.91, the following criteria are suggested to be considered by the trial court in determining the size of attorney fees to be awarded in a class action:

"(1) the number of hours spent on the case by the various attorneys and the manner in which they were spent;

"(2) the reasonable hourly rate for each attorney;

"(3) the contingent nature of success;

"(4) the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing [the] amount to which the court has found the attorney reasonable entitled."

Citing *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp.*, 487 F.2d 161, 166-69 (3rd Cir. 1973). This list of considerations is not exclusive, however. Other considerations include the amount involved, as it determines the risk of the client and the commensurate responsibility of the attorney, and the result of the case, because that determines the real benefit to the client. Of major importance is the consideration of the benefit the lawsuit has produced. 7A Wright & Miller, Federal Practice and Procedure: Civil § 1803, p. 289-90; *Oppenlander v. Standard Oil Company (Indiana)*, 64 F.R.D. 597 (D. Colo. 1974). In *State of Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221, 224 (N.D. Ill. 1972), the court recognized some attempt must be made by courts to suit the award of fees to the performance of the individual counsel in light of the time spent reaching a settlement, to prevent attorneys from taking advantage of class actions to merely obtain lucrative fees. See also 7A Wright & Miller, Federal Practice and Procedure: Civil § 1803, p. 292.

Even where there has been no objection to the amount of attorney fees requested, it is the responsibility of the court to determine the award to assure that the amount awarded is reasonable. The trial court must hold an evidentiary hearing so that it has before it sufficient information to make a fair and adequate fee award. 3B Moore's Federal Practice ¶ 23.91, p. 23-568. Many recent cases have required attorneys to produce detailed time records indicating the time expended by each lawyer and the nature of work done by each to allow the court to determine, among other things, the necessity for and quality of

the work done. See, *e.g., In Re Equity Funding Corp. of America Securities,* 438 F. Supp. 1303 (C.D. Cal. 1977); *Green v. Wolf Corporation,* 69 F.R.D. 568 (S.D. N.Y. 1976). This, however, is only to be used as a starting point to determine the appropriate fee. 7A Wright & Miller, Federal Practice and Procedure: Civil § 1803, p. 267-69 (1983 Supp.). Wright and Miller suggest, in addition, that the court should consider the contingent nature of succeeding in the action, which would be awarded in addition to the allowance for the quality of counsel's work. The reasons for the contingency award are (1) the plaintiffs' lawyer will not receive any compensation until the lawsuit is concluded and then only if he has been successful in securing a judgment for his clients, (2) unless both of these conditions are met the attorney will receive nothing for his efforts and will not be reimbursed for his expenses, and (3) lawyers who actively litigate class action cases largely depend on court-awarded fees for their economic survival. 7A Wright & Miller, Federal Practice and Procedure: Civil § 1803, pp. 274-75 (1983 Supp.).

Finally, where the established guidelines are followed by the district court, appellate review should be limited to abuse of discretion. *Lindy Bros. Builders, Inc. v. Am. Radiator, Etc.,* 540 F.2d 102, 116 (3rd Cir. 1976).

On cross-appeal the appellees contend the postjudgment rate of interest which should be applied is the statutory postjudgment rate as set forth in K.S.A. 1983 Supp. 16-204, rather than the contractual rate pursuant to the FPC undertaking. This statute provides, in pertinent part:

"(c) Any judgment rendered by a court of this state on or after July 1, 1982, shall bear interest on and after the day on which the judgment is rendered, at the rate of 15% per annum."

In *Shutts I* the court determined that K.S.A. 16-204 (Weeks) required payment of eight percent interest on the judgment until paid. The contractual rate of interest contained in the corporate undertaking was applied only to the prejudgment interest owing from the date of the receipt of the royalties until the date of judgment. Under our holding in *Shutts I* and K.S.A. 1983 Supp. 16-204, Phillips is required to pay fifteen percent per annum simple interest on the total amount of the judgment from the date of the judgment until paid.

Accordingly, the interest payable to the royalty owners in this case is the rate of interest set forth in Phillips' corporate undertaking with the FPC from the time Phillips first held royalties in suspense to the date of the judgment entered by the trial court and postjudgment simple interest at fifteen percent on the total amount of the judgment from the date of the judgment until paid.

The judgment of the lower court is affirmed as modified.