Larry R. SCOTT and Vera C. Scott,
Plaintiffs–Appellees,

v.

Dennis CROWN, d/b/a Crown Company,
Defendant–Appellant.

No. 85CA1075.

Colorado Court of Appeals,
Div. II.

Oct. 20, 1988.

As Modified on Denial of Rehearing
Nov. 25, 1988.

Richard E. Conour, Elizabeth A. Conour, Joseph Van R. Clarke (on the briefs), Del Norte, for plaintiffs-appellees.

Richard J. Jacobs, P.C., Richard J. Jacobs, Alamosa, for defendant-appellant.

PLANK, Judge.

In this breach of contract action, defendant, Dennis Crown d/b/a Crown Company (Buyer), appeals from a judgment entered in favor of plaintiffs, Larry and Vera Scott, and from the dismissal of Buyer's counterclaim against them. We reverse.

During February 1983, Larry Scott (Seller) and Buyer entered into contract No. 76 for the sale of 16,000 bushels of U.S. No. 1 wheat. Pursuant to the contract, Buyer paid Seller $2,000 as an advanced payment. With respect to payment of the contract balance, the agreement reads in part:

"Payment by Buyer is conditioned upon Sellers [sic] completion of Delivery of total quantity as set forth in this contract. Any payment made prior to completion of delivery is merely an accommodation. In making such accommodation, Buyer does not waive any condition of this contract to be performed by Seller."

Elsewhere, the contract provided that the full balance would be paid 30 days after shipment of the total contract quantity of grain.

By March 13, 1983, Seller had delivered all the wheat called for in the contract. Payment of the full contract balance of approximately $49,000 was due on April 13, 1983.

On March 1, 1983 Seller and Buyer executed contract 78–2 for the sale of 13,500 bushels of U.S. No. 1 wheat and contract No. 81–3 for the sale of approximately 30 truck loads of U.S. No. 1 wheat. These contracts are the subject of this action. With the exception of quantity, the contracts had identical terms and conditions as those in contract No. 76, including the above-quoted provision and the provision for full payment by Buyer 30 days after complete performance by Seller.

In early March 1983, Seller commenced performance of contract No. 78–2. By

March 15, 1983, he had delivered to Buyer approximately 9,086 bushels of wheat. However, he ceased performance because of his belief that Buyer could not pay for the wheat.

Seller was contracting with other grain dealers while working with Buyer. Seller suffered a loss on an unrelated contract. When reviewing this loss with his banker, Seller was told that Buyer was not the "best grain trader" and was advised to contact an agent from the Department of Agriculture for additional information about Buyer. The agent, Mr. Witt, indicated there was an active complaint against Buyer concerning payments to other farmers.

The next day, one of Buyer's trucks appeared at Seller's farm to take another load of grain. Seller refused to deliver the grain. Instead, he testified that he told the driver:

"that we had the grain, but were trying to get in touch with Mr. Crown, and my attorney advised me not to load until we had made contact with Mr. Crown to settle some questions that we had."

Seller and Witt testified that during the period of March 21 through April 6, 1983, they and Seller's attorney had attempted to contact Buyer several times by telephone, but were not successful.

By a letter dated March 23, 1983, Buyer responded to Seller's refusal to load the wheat. Buyer stated that he had not breached the contracts; however, Seller had breached the agreements. Buyer pointed out the payment terms requiring shipment of the full quantity before payment was due and requested that Seller resume performance. Otherwise, Buyer would be forced to "resort to cover."

Buyer followed up the letter with a April 4, 1983, correspondence in which he notified Seller that he was cancelling the contracts. However, he assured Seller that, if the contracts were performed, his company would pay according to the contract terms.

Through counsel, Seller replied by an April 6, 1983, letter. Counsel informed Buyer that his client had not been paid on the contracts and that Seller had received information that Buyer had been paid by his buyers. Counsel demanded assurances of performance that Buyer would pay for the grain shipped on the fully performed contract 76 and the partially performed contract 78–2. However, under the contract terms, payment was not due on contract 76 until April 13, 1983, and was not due on contract 78–2 until 30 days after full performance.

Buyer cancelled contracts 78–2 and 81–3 on April 7, 1983. He had previously contacted grain sellers in Denver and Salt Lake City to effect cover, but by this date the grain was no longer available.

Seller instituted suit on April 25, 1983, alleging breach of contract by Buyer in not paying in full for the grain prior to delivery pursuant to his demand for adequate assurance of performance.

The circumstances at issue bring this action within the scope of § 4–2–609(1), C.R.S., of the Uniform Commercial Code. That section provides:

"A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and, until he receives such assurance, may if commercially reasonable suspend any performance for which he has not already received the agreed return."

By the express language of this provision, reasonable grounds for insecurity about the performance of either party must exist in order for the other party to exercise further rights.

Buyer alleges that Seller did not have reasonable grounds for insecurity and, further, that the demand for assurance of due performance was defective. We disagree that there were no reasonable grounds for insecurity, but agree that the demand for assurance of due performance was defective.

■ Whether Seller had reasonable grounds for insecurity is a question of fact. *See AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir.1976). Since trial was to the court, we will not disturb the court's findings that Seller had reasonable grounds for insecurity unless it was clearly erroneous and not supported by the record. *See People in Interest of M.S.H.*, 656 P.2d 1294 (Colo.1983).

■ The trial court found that reasonable grounds for insecurity existed because: 1) Seller recently had had an unfortunate experience similar to the incident at issue with another grain dealer (*i.e.*, a pattern of unreturned phone calls culminating in nonpayment for a grain delivery); 2) Investigator Witt had informed Seller that his office had active complaints by other farmers against Buyer; and 3) Buyer failed to make personal contact after Seller refused to load the wheat. This evidence supports the trial court's conclusion of reasonable grounds for insecurity.

■ There are, however, serious problems with the timing, form, and content of Seller's demand for assurances of performance. The court found that Seller had made an oral demand for assurances by his refusal load the grain and his conversation with the driver on March 22, 1983. However, Seller did not make the written demand until his counsel's letter of April 6, 1983, some two weeks after he had suspended performance.

Generally, the express language of the statute is followed such that a demand for assurances of performance must be in writing in order to be effective. *National Ropes, Inc. v. National Diving Service, Inc.*, 513 F.2d 53 (5th Cir.1975); *Teeman v. Jurek*, 312 Minn. 292, 251 N.W.2d 698 (1977); *Bodine Sewer v. Eastern Illinois Precast*, 143 Ill.App.3d 920, 97 Ill.Dec. 898, 493 N.E.2d 705 (Ill.App. 4 Dist.); *Automated Energy Systems, Inc. v. Fibers & Fabrics of Georgia, Inc.*, 164 Ga.App. 772, 298 S.E.2d 328 (1982). However, in some cases an oral demand for assurances has sufficed. *See ARB, Inc. v. E–Systems, Inc.* 663 F.2d 189 (D.C.Cir 1980); *Diskmakers, Inc. v. Dewitt Equipment Corp.*, 555 F.2d 1177 (3rd Cir.1977); *AMF, Inc. v. McDonald's Corp., supra*. In such cases, there appears a pattern of interaction which demonstrated a clear understanding between the parties that suspension of the demanding party's performance was the alternative, if its concerns were not adequately addressed by the other party.

In *AMF, Inc., v. McDonald's Corp., supra*, for example, McDonald's had ordered 23 computerized cash registers from AMF. However, a prototype machine installed at a McDonald's franchise performed poorly. McDonald's personnel then met with AMF and demanded that the order for their 23 units be held up pending resolution of the problems experienced in the prototype. AMF failed to resolve the problem, and McDonald's cancelled the order. The court expressly rejected AMF's argument that McDonald's had not made a written demand, and held that McDonald's had properly invoked the pertinent Uniform Commercial Code provision.

Here, Seller made only the oral statement to Buyer's driver before he suspended performance. In our view, that was insufficient to make that suspension justified under § 4–2–609.

Also, there was not a subsequent pattern of interaction between the parties that would clearly demonstrate that Buyer understood that Seller had requested assurances of performance. Indeed, Buyer's letter of March 23, and April 4, 1983, demonstrated that he thought that Seller had inexcusably refused to perform the contracts. Hence, we conclude that the conditions necessary to validate an oral demand were not met here.

■ Moreover, even if we were to conclude that an oral demand would have been permissible here, the content of the alleged demand is deficient. In contrast to *AMF*, Seller did not communicate clearly to Buyer that he was demanding assurances of performance. He simply told Buyer's driver that he wanted to "settle" some questions with Buyer. A mere demand for meeting to discuss the contracts, even if it had been in writing, would not be sufficient

to constitute a proper demand for assurances. *Penberthy Electromelt v. U.S. Gypsum Co.*, 38 Wash.App. 514, 686 P.2d 1138 (1984).

■ Finally, a demand for performance assurances cannot be used as a means of forcing a modification of the contract. *Pittsburgh–Des Moines Steel v. Brookhaven Manor Water*, 532 F.2d 572 (7th Cir., 1976). *See generally* 4 R.A. Anderson, Uniform Commercial Code § 2–609 at 416 (3rd ed. 1983).

■ When Seller's counsel made the demand for assurances of performance, he demanded performance beyond that required by the contracts. In the April 6, 1983, letter, counsel requested payment in full of contract 76 and payment for the grain delivered on contract 78–2. At that time, Buyer was not obligated under the terms of the contracts to make such payments.

Under these facts, we conclude that Seller did not have the right to suspend performance because he failed to act in a manner that would bring him within the scope of § 4–2–609. Instead, Seller's action constituted an anticipatory repudiation which gave Buyer the right to cancel the contracts and resort to the buyer's remedies as provided in § 4–2–713, C.R.S.

This matter is remanded to the trial court to determine the following factual issues relating to Buyer's damages: (1) whether the grain being delivered was U.S. No. 1 wheat or a lesser quality; (2) the date Buyer first learned of the breach; and (3) the fair market value of the wheat on the date Buyer learned of the breach. Seller is entitled to all credit for grain sold and delivered and for which payment was not received.

Accordingly, the judgment is reversed and the cause is remanded with directions that the court enter judgment for Buyer after making findings on these issues.

SMITH and BABCOCK, JJ., concur.