(788 P.2d 878)
No. 63,849

SYSTEMS DESIGN AND MANAGEMENT INFORMATION, INC., *Appellee/ Cross-Appellant,* v. KANSAS CITY POST OFFICE EMPLOYEES CREDIT UNION, *et al., Appellant/Cross-Appellee.*

Opinion filed March 16, 1990.

*William T. Session,* of Polsinelli, White, Vardeman & Shalton, of Kansas City, Missouri, and *Bruce W. Beye,* of the same firm, of Overland Park, for appellant/cross-appellee.

*Charles R. Wilson,* of Overland Park, for appellee/cross-appellant.

Before RULON, P.J., LEWIS, J., and RICHARD W. WAHL, District Judge Retired, assigned.

WAHL, J.: Kansas City Post Office Employees Credit Union, appeals the trial court's judgment in favor of Systems Design and Management Information, Inc., (SDMI) on its counterclaims for breach of contract and fraudulent and negligent misrepresentation. It also appeals the trial court's application of Kansas law. SDMI cross-appeals on the trial court's entry of judgment for the credit union on SDMI's breach of contract claim.

On November 1, 1986, the Kansas City Post Office Employees Credit Union merged into the Kansas City Telephone Employees Credit Union. The surviving credit union is now called the Communications Credit Union (Credit Union). SDMI develops computer software programs for credit unions, using Burroughs, now Unisys, hardware. SDMI is not a service bureau. It does not furnish computer services from its computer system to credit unions or manage any data on a daily basis. SDMI furnished software to the Kansas City Post Office Employees Credit Union and had an ongoing business relationship with it beginning in 1984. Prior to the merger of the two credit unions, Robert Miller, a salesman for Burroughs, told Davis Tyler, president of SDMI, about the proposed merger and the two developed a proposal in an attempt to get the new credit union's account.

This proposal was jointly offered by SDMI and Burroughs, using the so-called Generic System software, the subject of this litigation, and Burroughs hardware. This proposal was dated November 4, 1986, and contained the following clause:

"The preliminary information and expression of confidence set forth in this recommendation of Burroughs products and/or services are submitted for your consideration and guidance only in the hope that we may be favored with your order. Since this proposal is preliminary only, the order when issued shall constitute the only legally binding commitment of the parties."

Sometime in November 1986, a demonstration of the software was held at SDMI's offices. Daniel Yantis, president and general manager of Credit Union, and Donald Cooper, vice-president in charge of marketing of Credit Union, recommended the purchase of the Generic System software and the credit union board accepted their recommendation. On November 25, 1986, Cooper phoned Davis Tyler of SDMI to say Credit Union would purchase the SDMI Generic System. This agreement between the parties

was oral and no written order for the software was ever issued. Credit Union was converted to the SDMI Generic System on February 1-2, 1987.

Immediately, major problems with the system became apparent. Some of the problems included inability to run the payroll, inability to generate certain daily reports, some nonfunctioning printers and terminals, and an inability to perform all the normal operations during regular working hours.

There is disagreement as to the cause of these problems. Ultimately, there were about 11,000 accounts after the merger of the credit unions. The parties disagree as to whether Credit Union disclosed or whether SDMI knew how many accounts the system would have to handle. There is further disagreement whether the number of accounts was misrepresented by Credit Union as 8,000 to 9,000 and whether Credit Union was informed by SDMI that with that number of accounts the system would not work efficiently. In any event, even after discovering that the system would have to handle 11,000 accounts, Cooper recommended that Credit Union proceed with the conversion.

After the conversion, there were many out-of-balance accounts, perhaps thousands. Through the efforts of both parties, the number of out-of-balance accounts was reduced to 293 by March 25, 1987.

On March 23, 1987, a meeting between Cooper and Tyler was held and they signed a "status chart" which outlined the major problems still to be solved by SDMI. This form stated, "When these items have been resolved all monies due SDMI will be paid." Apparently, all the items listed except installing a program to "correct blocking" were performed. The purpose of that program was to speed up the system and to accommodate the total membership of Credit Union. Also on March 23, 1987, Cooper gave Tyler a letter expressing understanding that "few conversions come off without a hitch" and thanking him for SDMI's efforts to deal with Credit Union's problems.

On March 19, 1987, Yantis and Cooper met with representatives of another company seeking software to replace the SDMI Generic System. Credit Union quit using the SDMI software on April 25, 1987, without having notified SDMI that it was switching to another software program.

SDMI filed suit against Credit Union to recover the outstanding indebtedness on the software. Credit Union counterclaimed for damages based upon breach of contract and negligent and fraudulent misrepresentation. The trial court entered judgment in favor of Credit Union on SDMI's cause of action and judgment for SDMI on Credit Union's counterclaim. These appeals followed judgment.

SDMI's business office is located in Kansas. Credit Union's business offices are located in Missouri.

Credit Union argues that the trial court should have applied Missouri law in this case. The trial court applied Kansas law, acknowledging the *lex loci contractus* principle. The court then found the demonstration of the Generic System was in Kansas, Credit Union telephoned SDMI at SDMI's Kansas office to express intent to purchase the software, and the March 23, 1987, document was signed in Kansas; thus, Kansas law governed.

The actual event which constituted the breach is not clear from the record on appeal or from the journal entry filed by the court. In *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 679 P.2d 1159 (1984), *rev'd in part on other grounds,* 472 U.S. 797, 86 L.Ed. 2d 628, 105 S. Ct. 2965 (1985), the court stated, "The general rule is that the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred." 235 Kan. at 221. Although the choice of law portion of the opinion was reversed in the later United States Supreme Court case, 472 U.S. at 822-23, the general rule is still applicable insofar as it does not conflict with constitutional limitations. As long as Kansas has " 'significant contact or significant aggregation of contacts' . . . to ensure that the choice of Kansas law is not arbitrary or unfair," constitutional limits are not violated. 472 U.S. at 821-22. In the case at bar, the contacts with both Kansas and Missouri are numerous, and the choice of one state's law over another does not appear to raise constitutional issues.

It is not expressly clear from the record or from the journal entry that Missouri law should apply. Therefore, the trial court did not err in holding Kansas law applied to the merits of this case. The trial court relied upon a different rule than we have discussed, but "[t]he reasons given by the district court for its

decision are immaterial so long as its ruling was correct for any reason." *Prairie State Bank v. Hoefgen,* 245 Kan. 236, 245, 777 P.2d 811 (1989).

For its cross-appeal, SDMI argues the Uniform Commercial Code should have governed the trial of this case because computer software is "goods" under the U.C.C. We agree. The pretrial order set forth questions of law for determination at trial, including application of the U.C.C. However, there were no explicit findings at trial concerning the applicability of the U.C.C.; whether the software qualified as "goods," and, if so, the duties of the parties as to statutory requirements; and whether SDMI's cause of action for breach of contract was barred by the statute of frauds under the U.C.C.

"Goods" is defined in Article 2 of the U.C.C. as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." K.S.A. 84-2-105(1). Kansas has not decided the question of whether computer software falls under this definition of goods, and neither have most jurisdictions.

The character of computer software has been addressed in the context of tangible versus intangible personal property for the purpose of taxation. *In re Tax Protest of Strayer,* 239 Kan. 136, 716 P.2d 588 (1986). In *Strayer* the court held that application software programs, as opposed to operational programs, are intangible personal property and not subject to the personal property tax. 239 Kan. at 143. The U.C.C. is, however, a totally different statutory scheme with a purpose quite different from the tax code. According to K.S.A. 84-1-102(2), the purpose and policy of the U.C.C. is:

"(a) to simplify, clarify and modernize the law governing commercial transactions;

"(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

"(c) to make uniform the law among the various jurisdictions."

We must determine whether the oral agreement between SDMI and Credit Union was for goods or services. The test when dealing with a mixed contract is " 'not whether they [goods or services] are mixed, but, granting that they are mixed, whether

their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved.' " *Care Display, Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 238, 589 P.2d 599 (1979) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 [8th Cir. 1974]).

Contracts for a data processing service's skill, *Liberty Fin. Mgmt. v. Beneficial Data*, 670 S.W.2d 40, 48-49 (Mo. App. 1984), and contracts for analysis, collection, storage, and reporting of data, *Computer Servicenters, Inc. v. Beacon Manufacturing Co.*, 328 F. Supp. 653 (D.S.C. 1970), have been held not to fall under the U.C.C. as sales of goods. In the present case, there is general agreement that SDMI is not a service bureau so these cases would be inapplicable.

Another line of cases involves contracts for the sale of custom software designed specifically for the customer's needs. In *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985), the court found the sales aspect of the transaction to be predominant while employee training, repair services, and system upgrading were all incidental to the sale of the software. The court did say, due to the variance in software based upon the needs of the customer, it would engage in a case-by-case analysis on this issue. In *Data Processing v. L. H. Smith Oil Corp.*, 492 N.E.2d 314, 319 (Ind. App. 1986), the court found software was not goods. This case involved custom-designed accounting software and the court reasoned the contract was for the program producer's "knowledge, skill, and ability," and the product on which the program was transmitted was incidental to the contract.

The cases in which we find the closest analogy to the case before us involve the sale of both computer hardware and software as a system. SDMI and Burroughs offered a joint proposal of sale to the credit union. Burroughs would provide the hardware and SDMI would furnish the software. Of course, the case before us involves only the software, not the hardware.

In *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F. Supp. 765 (E.D.N.Y. 1978), *modified* 604 F.2d 737 (2d Cir. 1979), Triangle purchased hardware and software from Honeywell. Recognizing that payment was made for the purchase price of the system and not for services to install or maintain it, the court

stated the contract was one for sale. "Although the ideas or concepts involved in the custom-designed software remained Honeywell's intellectual property, Triangle was purchasing the product of those concepts." 457 F. Supp. at 769. In *Neilson Bus. Equip. Ctr. v. Monteleone,* 524 A.2d 1172 (Del. 1987), the court ruled sale of computer hardware and software as a package, termed a turn-key system, was goods and the consulting services provided with the sale were ancillary to the contract. 524 A.2d at 1174-75.

Prior to entering into an agreement for the Generic System software, Credit Union attended a demonstration of the program at SDMI's place of business. Therefore, we conclude the software was movable at the time of identification to the contract, satisfying that requirement of the definition of goods. SDMI installed the Generic System software on Credit Union's computer and was present to attempt modifications and corrections of the program so the accounting system would run more efficiently. These services are incidental to the sale of the software because, without Credit Union buying the Generic System program, the services would not be necessary. Therefore, the sale of the software is predominant. SDMI remains the owner of the accounting program as intellectual property. Credit Union purchased only a reproduction or the result of the programmer's skill. Credit Union is interested only in the outcome of running the program and whether the program will perform the functions for which it was purchased.

We hold this software to be goods and subject to the provisions of the U.C.C. This holding is consistent with the purpose of the U.C.C. It simplifies commercial transactions. It provides a uniform rule for courts to follow.

Having found the application of the U.C.C., we need not determine the other issues raised on appeal, such as whether Credit Union's counterclaim was considered by the court. It was not considered under the provisions of the U.C.C., nor were the other issues raised.

We affirm the trial court's application of Kansas law at the hearing of this case. The remaining judgment of the trial court

is reversed and remanded for further proceedings in accordance herewith.