**HOPE'S ARCHITECTURAL PRODUCTS, INC.,**
Plaintiff,

v.

**LUNDY'S CONSTRUCTION, INC., and Bank IV Olathe, N.A., Defendants.**

**Civ. A. No. 89–2137–L.**

United States District Court,
D. Kansas.

Dec. 18, 1991.

See also 762 F.Supp. 1430.

Shawn E. DeGraff, Charles E. Fowler, III, McDowell, Rice & Smith, P.C., Overland Park, Kan., for plaintiff.

Peter V. Ruddick, Speer, Austin, Holliday & Ruddick, Olathe, Kan., for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This case presents a familiar situation in the field of construction contracts. Two parties, who disagreed over the meaning of their contract, held their positions to the brink, with litigation and loss the predictable result of the dispute. What is rarely

predictable, however, (and what leads to a compromise resolution of many construction disputes when cool heads hold sway) is which party will ultimately prevail. The stakes become winner-take-all.

Plaintiff Hope's Architectural Products (Hope's) is a New York corporation that manufactures and installs custom window fixtures. Defendant Lundy's Construction (Lundy's) is a Kansas corporation that contracted to buy windows from Hope's for a school remodeling project. Defendant Bank IV Olathe (Bank IV) is a national banking organization with its principal place of business in Kansas. Bank IV acted as surety for a statutory bond obtained by Lundy's for the remodeling project.

Hope's contends that Lundy's breached the contract to buy windows, entitling Hope's to damages in the amount of the contract price of $55,000. Hope's also contends that Bank IV wrongfully refused to pay Hope's on the bond when Lundy's breached the contract. Hope's has sued for breach of contract, and in the alternative, for recovery under the theory of *quantum meruit*. A trial to the Court was held December 4 and 5, 1991. Two issues emerged as pivotal to the resolution of this case: (1) when was delivery of the windows due, and (2) if delivery was late, could Hope's lawfully suspend performance and demand certain assurances, (including ultimately, a demand for prepayment in full) that Lundy's would not back charge for the late delivery under the authority of K.S.A. § 84-2-609? Because the Court finds that a determination of these issues leads to the conclusion that Hope's was the party in breach of this contract, the plaintiff's request for relief is denied.

## I. FACTS

The following findings of fact are entered pursuant to Fed.R.Civ.P. 52. On June 13, 1988, defendant Lundy's entered into a contract with the Shawnee Mission School District as general contractor for the construction of an addition to the Rushton Elementary School. Lundy's provided a public works bond in connection with the Rushton project as required by K.S.A.

§ 60–1111 (1983). The purpose of the bond was to insure that Lundy's paid any outstanding indebtedness it incurred in the construction of the project. The statutory bond was secured through defendant Bank IV.

Plaintiff Hope's is a manufacturer of custom-built windows. The initial contact between Hope's and Lundy's occurred through Mr. Richard Odor, a regional agent for Hope's in Kansas City. On June 29, 1988, Hope's contracted with Lundy's to manufacture ninety-three windows for the Rushton project. The contract price, including the cost of labor and materials for the windows, was $55,000.

Although the contract included a term pertaining to the time for delivering the windows, there is some controversy over the meaning of this provision. Even under the most favorable interpretation to Hope's, however, delivery was due twelve to fourteen weeks after Hope's received approved shop drawings from Lundy's on July 18. Thus, delivery was due no later than October 24, 1988.

During the late summer and fall of 1988, several discussions took place between Hope's and Lundy's concerning when the windows would be delivered to the job site. Production of the windows was delayed by events that, according to the testimony of Mr. Odor, were not the fault of Lundy's. On September 27, 1988, Mark Hannah, vice president of Lundy's, wrote to Hope's requesting that installation of the windows begin by October 19, and be completed by October 26. On October 14 Hannah again wrote to Hope's, threatening to withhold "liquidated damages" from the contract price if Hope's did not comply with these deadlines. Although there was no provision in the contract for liquidated damages, Hope's did not make any response to the October 14 letter.

The windows were shipped from Hopes' New York plant to Kansas City on October 28. Delivery to the Rushton site was anticipated on November 4. On November 1, Hannah called Hopes' office in New York to inquire about the windows. He spoke to Kathy Anderson, Hopes' customer service

manager. The substance of this conversation is disputed. Hope's claims that Hannah threatened a back charge of $11,000 (20% of the contract price) for late delivery of the windows. Hannah testified, however, that although the possibility of a back charge was discussed, no specific dollar amount was mentioned. Hannah specifically denies that he threatened to withhold $11,000 from the contract.

After her conversation with Hannah, Anderson immediately informed Chris Arvantinos, vice president of Hope's, of the threatened back charge. Arvantinos called Hannah to discuss the back charge, but he does not recall hearing Hannah mention the $11,000 figure. Arvantinos requested that Hannah provide assurances that Lundy's would not back charge Hope's, but Hannah was unwilling to provide such assurances.

In a letter written on November 2, Arvantinos informed Hannah that Hope's was suspending delivery of the windows until Lundy's provided assurances that there would be no back charge. Hannah received this letter on the morning of November 3, shortly before Mr. Odor visited Hannah at Lundy's. Odor, who had spoken with Arvantinos about the back charge, issued a new demand that Lundy's had to meet before Hope's would deliver the windows. He gave Hannah an invoice for the full amount of the contract price, demanding prepayment before the windows would be delivered.

Odor set out three ways that Lundy's could meet this demand: (1) payment of the contract price in full by cashier's check; (2) placement of the full contract price in an escrow account until the windows were installed; or (3) delivery of the full contract amount to the architect to hold until the windows were installed. All three options required Lundy's to come up with $55,000 before the windows would be delivered. Hannah believed that the demand present-

ed by Odor superseded the letter from Arvantinos he received earlier that morning.

Hannah informed Odor that there was no way for Lundy's to get an advance from the school district at that time to comply with Hopes' request. The meeting ended, Lundy's did not prepay, and Hope's did not deliver the windows. On November 7, 1988, Lundy's terminated the contract with Hope's. Thereafter, Lundy's obtained an alternate supplier of the windows.

On February 15, 1989, Hope's notified defendant Bank IV of Lundy's failure to pay the contract price and demanded payment from Bank IV on the public works bond. Bank IV refused to pay Hopes' claim. This action was filed by Hope's on March 20, 1989. Jurisdiction of the matter rests with this Court pursuant to 28 U.S.C. § 1332.[1]

## II. DISCUSSION

At the outset, the Court concludes that the Uniform Commercial Code (UCC) governs this transaction. Article 2 of the UCC applies to transactions in goods. K.S.A. § 84–2–102 (1983). The contract at issue in this case involved a mixed goods/services transaction. Whether the UCC applies to hybrid transactions such as this depends upon " 'whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved ... or is a transaction of sale, with labor incidentally involved.' " *Systems Design & Management Information, Inc. v. Kansas City Post Office Employees Credit Union,* 14 Kan.App.2d 266, 270–71, 788 P.2d 878 (1990). If the UCC applies, it applies to all facets of the transaction. *Rajala v. Allied Corp.,* 66 B.R. 582, 591 (D.Kan.1986), *rev'd in part on other grounds,* 919 F.2d 610 (10th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). The transaction at issue in this case primarily involved a sale of windows, with installation and manufacturing services provided as an inci-

---

1. Although the parties did not address this issue, the Court concludes that Kansas law applies to this dispute. The transaction at issue bears "an appropriate relation to this state," making the application of Kansas law not arbitrary or un-
fair. K.S.A. § 84–1–105(1) (1983); *Systems Design & Management Information, Inc. v. Kansas City Post Office Employees Credit Union,* 14 Kan. App.2d 266, 269, 788 P.2d 878 (1990).

dental component. Therefore, the UCC applies.

### A. *Plaintiff's Contract Claim Against Defendant Lundy's*

This case turns on the resolution of two central and interrelated issues: (1) when was delivery due under the contract, and (2) could Hope's lawfully demand the assurances it demanded from Lundy's under K.S.A. § 84–2–609.[2] If the demands for assurances were proper, then Hope's would have been justified in suspending its performance and withholding delivery and Lundy's failure to provide assurances and subsequent termination of the contract amounted to a total breach. If, however, the demands for assurances were not proper under 84–2–609 then Hope's breached the contract by wrongfully withholding delivery of the windows and Lundy's was entitled to cancel the contract. The delivery date issue is addressed first because the matter of whether or not Hope's was already in breach for late delivery goes directly to the propriety of its demand for assurances.

#### 1. Delivery Date

■ Even under Hopes' interpretation of the delivery term, delivery of the windows was not timely.[3] At trial, Chris Arvantinos, Hopes' vice president, testified that Hope's committed to deliver the windows twelve to fourteen weeks after July 18, 1988, the day Hope's received approved shop drawings. This would make delivery due between October 10 and October 24. In fact, the windows did not arrive in Kansas City until November 4, fifteen and one-half weeks after July 18. Hope's claims that this delay was "immaterial" and did not excuse Lundy's from its duties under the contract. Hope's is unable to cite any controlling authority to support this argument, however. Moreover, this argument misses the point. Even if an "immaterial" delay did not excuse future performance by Lundy's, no performance was due from Lundy's until the windows were delivered to the job site, which never occurred.

Hope's also argues, almost in passing, that the delay was caused by problems that were outside of its control, thus excusing Hope's from responsibility for the late delivery. Under a clause in the contract, Hope's disclaimed responsibility "for delayed shipments and deliveries occasioned by strikes, fires, accidents, delays of common carriers or other causes beyond our control...." (Plaintiff's exhibit 11, ¶ 3). During the course of production, Hope's experienced problems with its "bonderizing" and prime paint system, which resulted in a delay in production of approximately two weeks. (Defendants' exhibit 403). Hope's produced no evidence at trial, however, to show that this was a matter which was beyond its control. Moreover, it is interesting to note that Hope's did not contemporaneously seek from Lundy's any extension of the delivery date under this provision or notify Lundy's that it might result in a delay beyond October 24. It appears that reference to this clause is more of an afterthought born of litigation than a bona fide excuse for modifying the delivery date.

---

**2.** Section 2–609 provides:

> 84–2–609. Right to adequate assurance of performance. (1) ... When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
> K.S.A. § 84–2–609 (1983).

**3.** "Delivery" is defined by Black's Law Dictionary as "[t]he act by which the res or substance thereof is placed within the actual or constructive possession or control of another.... What constitutes delivery depends largely on the intent of the parties." *Black's Law Dictionary* 385 (5th ed.1979). In this case, the parties bargained for more than mere shipment of the windows. Arvantinos testified that Hope's committed to delivering the windows to the job site between October 10 and October 24. Thus, delivery was to occur under the parties' agreement when the windows arrived in Kansas City and were available for installation at the Rushton job site.

Hope's also contends that a three to four day delay resulted when Lundy's asked for a change in the design of the windows to include "weep holes" after production had already begun. However, Hopes' representative, Odor, testified that nothing Lundy's did delayed Hopes' manufacturing. Moreover, even accounting for this delay, Hope's was a week late delivering the windows.

### 2. Section 2–609 Demand for Assurances

■ The framework for judging demands for assurances under 84–2–609 was set forth in *LNS Investment Co., Inc. v. Phillips 66 Co.*, 731 F.Supp. 1484, 1487 (D.Kan.1990):

> To suspend its performance pursuant to [84–2–609], defendant must (1) have had reasonable grounds for insecurity regarding plaintiff's performance under the contract, (2) have demanded in writing adequate assurance of plaintiff's future performance and (3) have not received from plaintiff such assurance.

White and Summers note that what constitutes a "reasonable ground" for insecurity and an "adequate assurance" are fact questions. J. White & R. Summers, *Uniform Commercial Code* § 6–2, at 236 (3d ed. 1988). Reasonableness and adequacy are determined according to commercial standards when, as is the case here, the parties are merchants. K.S.A. § 84–2–609(2) (1983).

Although nothing in the record indicates that Hope's expressly claimed any rights under 84–2–609 during the course of this transaction, Hope's asserted at trial that the October 14 letter from Lundy's demanding delivery by October 16 and threatening liquidated damages gave Hope's reasonable grounds for insecurity. Delivery was not due until October 24 under Hopes' version of the parties' agreement, and Lundy's had no right to demand performance early, let alone broach the withholding of liquidated damages. This letter might have justified a demand for assurances under 84–2–609. However, Hope's made no such demand after receiving the letter. Instead of invoking its rights under 84–2–609, Hope's chose not to respond at all to Lundy's threat of liquidated damages. This event merely came and went without any legal consequence.

Hope's in effect invoked its rights under 84–2–609 in response to Lundys' threat of a back charge during the November 1 phone conversations. Two separate demands for assurances were made in response to this threat. Initially, Chris Arvantinos demanded assurances that Lundy's would not back charge Hope's for the delayed shipment in a telephone conversation with Mark Hannah later in the day on November 1. Arvantinos memorialized this demand in a letter composed on that day and mailed on the second of November. In their telephone conversation, Hannah refused to provide assurances that Lundy's would not back charge Hope's.

Hope's made a second demand for assurances on November 3, when Richard Odor presented Hopes' invoice to Hannah demanding payment in full. Thus, Hope's demanded assurances that it would not be back charged on November 1, and when that demand was refused, Hope's made a second demand on November 3. The Court finds that Hope's was not entitled to invoke 84–2–609 on either occasion.

When Hope's made its first demand for assurances on November 1, it was already in breach of the parties' agreement. Delivery of the windows was due by October 24, but the windows did not arrive in Kansas City until November 4. A party already in breach is not entitled to invoke section 2–609 by demanding assurances. *United States v. Great Plains Gasification Associates*, 819 F.2d 831, 835 (8th Cir.1987); *cf. Sumner v. Fel-Air, Inc.*, 680 P.2d 1109 (Alaska 1984) (2–609 does not apply after a breach has already occurred). To hold otherwise would allow a party to avoid liability for breaching its contract by invoking 2–609 to extract from the nonbreaching party an assurance that no damages will be sought for the breach. A nonbreaching party in need of prompt performance could be coerced into giving up its right to damages for the breach by giving in to the demands in order to receive the needed

performance. This Court refuses to endorse such a result.

The assurances which Hope's demanded, moreover, were excessive. "What constitutes 'adequate assurance' is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir.1985). "If the assurances he demands are more than 'adequate' and the other party refuses to accede to the excessive demands, the court may find that the demanding party was in breach or a repudiator." J. White & R. Summers, *supra*, § 6–2, at 236.

Lundy's argues that Hopes' demand for assurances in the November 2 letter from Arvantinos was overly broad and unreasonable. The letter informed Lundy's that Hope's would not deliver the windows to the job site until it received assurances that it would not "be backcharged or otherwise held responsible for liquidated damages, delay charges *or any extra costs on account of time of delivery of the windows.*" (Plaintiff's exhibit 23) (emphasis added). When this demand was made, the windows had not yet arrived in Kansas City. Therefore, the parties did not know at this time whether the proper quantity of windows had been shipped, whether the windows were the correct size, or whether they otherwise met Lundy's specifications. If there were any nonconformities in the shipment, there could have been another delay in the time of delivery while Hope's corrected the problem. Yet, Hope's demanded a blanket assurance that it would not be held responsible for *any extra costs* incurred because of "time of delivery of the windows." This demand was overly broad on its face and unreasonable under 84–2–609.

The assurances Hope's demanded on November 3 were also excessive. In his meeting with Mark Hannah, Richard Odor insisted that Lundy's prepay the contract price, deliver a cashier's check to the architect, or place the full contract price in an escrow account before the windows would be delivered. Yet, Lundy's never gave any indication that it was unable or unwilling to pay the amount it owed to Hope's when the windows were delivered and the bond stood as security for Lundy's obligation. Such a demand was unreasonable and amounted to a breach by Hope's. *See Pittsburgh–Des Moines Steel v. Brookhaven Manor Water Co.*, 532 F.2d 572, 578–82 (7th Cir.1976) (demanding under 2–609 a personal guarantee of payment from a shareholder, or that other party escrow the entire amount of the contract price before it was due, absent any showing of an inability to pay, was unreasonable); *Scott v. Crown*, 765 P.2d 1043 (Colo.Ct.App.1988) (demanding payment in full before it was due was unreasonable demand under 2–609 and amounted to anticipatory breach). The payment terms under the contract were "Progress payments by the 10th of each month covering 90% of the total value of materials delivered and installation performed during the previous month with final payment upon completion of our [Hopes'] work." (Plaintiff's exhibit 11). By demanding prepayment, Hope's essentially attempted to rewrite this term of the contract. *Pittsburgh–Des Moines Steel*, 532 F.2d at 578–82 (2–609 may not be used to force a contract modification); *Scott*, 765 P.2d 1043 (same).

Although Hope's contends that a threatened back charge of $11,000 for a one week delay in shipment justified its demand for prepayment, the Court is not persuaded that Lundy's made any specific demand for $11,000. The testimony on this issue was controverted, but only Kathy Anderson, Hopes' customer service manager, testified, in a perfunctory manner, that an $11,000 back charge was threatened. Mark Hannah specifically denied making such a demand. Neither Chris Arvantinos nor Richard Odor testified to recalling receiving such a demand. There was also testimony at trial from one witness for Hope's that the threatened back charge was in the amount of $5,000. The Court is not persuaded that Lundy's went beyond making unspecified threats of a back charge for

possible damages it would incur because of Hopes' delay.

By threatening to withhold damages from the contract price, Lundy's was merely exercising its rights under K.S.A. § 84–2–717,[4] which entitles a buyer to deduct from the amount owing on the contract any damages from the seller's breach. *See, e.g., Patel v. Telerent Leasing Corp.,* 574 So.2d 3 (Miss.1990); *Teeman v. Jurek,* 312 Minn. 292, 251 N.W.2d 698 (1977). Giving notice of its intention to avail itself of a legal right did not indicate that Lundy's was unwilling or unable to perform under the contract. Indeed, the very nature of the right invoked by Lundy's manifests an intention that it would continue performing and pay the contract price due, less damages caused by Hopes' delay. Thus, the demand for prepayment was unreasonably excessive when there was no indication that Lundy's would not pay Hope's when performance was due.

Both Hopes' delay in delivering the windows and Hopes' excessive demands entitled Lundy's to treat Hope's as in breach and to cancel the contract, which it did on November 7, 1988. K.S.A. § 84–2–711 (1983) ("Where the seller fails to make delivery or repudiates ... the buyer may cancel...."). Thus, Hope's is not entitled to recover under its claim for breach of contract.

### B. *Plaintiff's Quantum Meruit Claim*

Hope's also claims that it is entitled to compensation from Lundy's under the theory of *quantum meruit.* "*Quantum meruit*," which literally means "as much as he deserves," is a phrase used often in older cases to describe an equitable doctrine premised on the theories of unjust enrichment and restitution. *Black's Law Dictionary* 1119 (5th ed.1979). Recovery was allowed under this theory when a benefit had been received by a party and it would be inequitable to allow the party to retain it. E. Farnsworth, *Contracts*

§ 2.20, at 103 n. 4 (2d ed.1990). Instead of labeling it *quantum meruit,* courts today speak in terms of restitution. *See Pioneer Operations Co. v. Brandeberry,* 14 Kan. App.2d 289, 789 P.2d 1182 (1990).

■ To recover in restitution, a breaching plaintiff must have conferred a benefit on the nonbreaching party. *See Walker v. Ireton,* 221 Kan. 314, 559 P.2d 340 (1977) (right to restitution limited to expenditures or services that benefitted other party); *Restatement (Second) of Contracts* § 374 (1979). The burden is on the breaching party to prove the extent of the benefit conferred, and doubts will be resolved against him. *Restatement (Second) of Contracts* § 374 comment b (1977).

■ In this case, Hope's conferred no benefit on Lundy's. The windows manufactured by Hope's were never used in the Rushton project, and the Court is not persuaded that the installation advice provided by Christiansen Steel Erection for Hope's improved the project. Hope's admits that the only labor it claims to have provided at the Rushton job site was consultation work performed by Christiansen Steel Erection, a company Hope's subcontracted with to install the windows. Mike and John Christiansen visited the job site on several occasions to advise Lundy's on how to prepare the window openings for installation. The advice they provided, however, related to the installation of windows that were never used on the project. When Lundy's canceled its contract with Hope's, it obtained an alternate supplier of a different type of windows. These windows did not require the same careful preparation of the window openings as the Hope's windows. Lundy's job foreman testified that the Christiansens' advice became moot when the alternate supplier was obtained. "[A] party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest." *Restatement (Second) of Contracts* § 370 comment a (1977). Thus, be-

---

**4.** "84–2–717. Deduction of damages from the price. The buyer on notifying the seller of his intentions to do so may deduct all or any part of the damages resulting from any breach of the

contract from any part of the price still due under the same contract." K.S.A. § 84–2–717 (1983).

cause no benefit was conferred upon Lundy's, Hope's has no valid claim to restitution.[5]

### III. CONCLUSION

After careful consideration of the facts and law, this Court holds that Hope's breached the contract in question. Therefore, defendant Lundy's was entitled to cancel its performance and defendant Bank IV was not obligated to pay Hope's under the statutory bond.

IT IS THEREFORE ORDERED that plaintiff's claims for relief are hereby denied, and judgment is entered in favor of defendants.

IT IS SO ORDERED.

---

**5.** Because the Court holds that Hope's is not entitled to recover from Lundy's for breach of contract or restitution, the claim against defendant Bank IV under the statutory bond must also be denied.