24CA2004 Holder v Cisneros Mosqueda 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2004
Adams County District Court No. 23CV30170
Honorable Sarah E. Stout, Judge

---

William F. Holder,

Plaintiff-Appellee,

v.

Oscar A. Cisneros Mosqueda,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SCHOCK
Grove and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Anderson Hemmat, L.L.C., Chad P. Hemmat, Cameron O. Hunter, Greenwood Village, Colorado, for Plaintiff-Appellee

Baker & Hostetler LLP, Sammantha J. Tillotson, Denver, Colorado; Baker & Hostetler LLP, G. Karl Fanter, Cleveland, Ohio, for Defendant-Appellant

¶ 1    Defendant, Oscar A. Cisneros Mosqueda, appeals the judgment in favor of plaintiff, William F. Holder, on Holder's negligence claim. He contends that the district court erred by denying his motion to enforce a settlement agreement. We affirm.

## I.    Background

¶ 2    This case arises out of a car accident between Cisneros Mosqueda and Holder for which Cisneros Mosqueda was at fault.

### A.    Settlement Communications

¶ 3    In December 2022, Holder's attorney, Kylan J. King of the Bendinelli Law Firm (Bendinelli), made a demand upon Cisneros Mosqueda's insurer, Fred Loya Insurance (FLI), for payment of Cisneros Mosqueda's policy limit. FLI agreed to pay the policy limit of $25,000 in exchange for a release of liability.

¶ 4    On January 5, 2023, Holder executed a release of his claims against Cisneros Mosqueda and FLI. The release provided:

> That [Holder] . . . for sole consideration of Twenty Five Thousand Dollars . . . to be paid to [Holder] do/does hereby . . . release, acquit and forever discharge [Cisneros Mosqueda and FLI] . . . of and from any and all claims, actions, causes of action, demands, liens known and unknown . . . resulting or to result from the accident . . . .

¶ 5     The next day, King sent FLI the executed release and stated that Holder accepted FLI's offer of $25,000 "to resolve this matter." King explained that Holder was "in desperate need of this settlement" and asked if FLI could "expedite" the payment.

¶ 6     Days after receiving the executed release, FLI learned that Holder was subject to a medical lien.  On January 24, FLI told King that it would need a lien agreement or a lien release before it could finalize payment.  According to an FLI claims adjuster, King agreed to "get the [lien] resolved" and told the claims adjuster how to "divide the checks up" between Holder and the lienholder.

¶ 7     Having still not received payment three weeks after signing the release, Holder retained a new attorney, Chad Hemmat from the law firm of Anderson Hemmat.  On January 27, Hemmat sent FLI a letter explaining that he had "been asked to intervene as counsel" for Holder.  He asserted that the settlement agreement "says nothing about any holdback of proceeds for liens" and that FLI had breached the agreement by "refusing to issue any portion of the check until the health insurance lien is resolved."  Then, after noting that the lien was for $1,745.07, the letter concluded:

> To avoid me declaring a breach of the settlement agreement and then suing your insured where limits settlement will never be discussed again, we demand you tender the balance of the settlement proceeds minus the [medical] lien to be issued payable to William Holder and the Bendinelli Law Firm ONLY with written confirmation to me that this check has been tendered on or before end of business one week from today. If we have no assurance that the check has been tendered by then, consider the agreement in breach and your insured will be sued without any further warning or discussion.

¶ 8    On February 3 — the deadline for payment set by the demand letter — FLI prepared two checks: one to Bendinelli and Holder for $23,254.93, and one to the lienholder for $1,745.07.[1]  The mailing address on the check to Bendinelli and Holder was incorrect, mistakenly showing the state as Texas rather than Colorado.  FLI also sent a letter dated February 3 to Bendinelli — again with the erroneous Texas address — confirming that FLI had issued the two checks and mailed them to Bendinelli at the Texas address.

¶ 9    The record is not clear as to when FLI sent the checks, which were never cashed.  Holder's wife attested that an FLI representative

---

[1] More precisely, the check to Bendinelli and Holder was dated February 3, and the check for the lien was dated February 2.

told her on February 8 that the checks had not yet been sent. That same day, King instructed FLI by email to "void both checks sent to" Bendinelli. And months later, during this litigation, King told FLI that Bendinelli never received the checks. But months after that, Bendinelli found the check to Holder in its files, with a date stamp of February 10, and provided a copy to Anderson Hemmat.

¶ 10    Either way, Hemmat did not receive notice by February 3 that the checks were sent (and did not learn of the checks' existence until months into this lawsuit). He therefore filed a complaint on Holder's behalf shortly after the close of business that day, suing Cisneros Mosqueda for negligence.

### B.    Motion to Enforce Settlement

¶ 11    Cisneros Mosqueda filed a motion to enforce the settlement and dismiss the case. He argued that the parties had entered into a valid settlement agreement on January 6, 2023, when Holder returned the signed release, and that FLI had fulfilled its obligations under that agreement by sending the checks to Bendinelli. Though acknowledging the error in the mailing address, Cisneros Mosqueda asserted that the checks "should have reached the correct address."

¶ 12    In response, Holder argued that (1) there was no meeting of the minds regarding the resolution of liens; (2) if there was a valid settlement agreement, FLI materially breached it by refusing to make payment until the lien issue was resolved; and (3) Hemmat's January 27 letter was a renewed settlement offer that FLI did not properly accept because it did not provide written confirmation to Hemmat and could not show the checks were ever delivered.

¶ 13    Cisneros Mosqueda replied that the parties "expected" that the amount Holder would actually receive would be "$25,000 minus the amount necessary to satisfy the lien." He therefore asked the court to "supply[] a term to the settlement agreement that allows FLI to pay from the settlement proceeds the amount necessary to satisfy the medical lien directly to the lien holder, then pay the balance to" Holder. Alternatively, he argued that he accepted Holder's counteroffer by issuing the checks on February 3 and mailing them to Bendinelli — albeit, with a "clerical error" in the address.

¶ 14    After an evidentiary hearing, the district court denied the motion to enforce the settlement. It first found that the initial release was a valid settlement agreement that required FLI to pay Holder $25,000 in exchange for release of Holder's claims, with no

withholding of such funds for payment of the lien. The court found that FLI materially breached that agreement by failing to pay Holder $25,000, thus allowing Holder to terminate the agreement.

¶ 15 As to the January 27 letter, the court found that it was a new offer of settlement with two conditions: (1) issuance of the checks to Bendinelli; and (2) written confirmation to Hemmat. Because FLI did not provide timely written confirmation to Hemmat, the court concluded that there was no acceptance and, thus, no contract.

¶ 16 The case proceeded to a jury trial. The jury found Cisneros Mosqueda liable and awarded Holder $450,000 in damages.

## II. Analysis

¶ 17 In arguing that the district court erred by denying his motion to enforce the settlement agreement, Cisneros Mosqueda identifies three potential sources of that agreement: (1) the January 5 signed release; (2) King's subsequent agreement to have the lien paid out of the settlement proceeds; and (3) Hemmat's January 27 letter. We conclude that Cisneros Mosqueda failed to carry his burden of showing that any of these gave rise to an enforceable contract that barred Holder from suing.

6

## A.  Applicable Law and Standard of Review

¶ 18    Colorado public policy favors the settlement of disputes.  *Colo. Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo. 1992).  But a settlement agreement is just a contract, and it must be construed and enforced like any other contract.  *Resol. Tr. Corp. v. Avon Ctr. Holdings, Inc.*, 832 P.2d 1073, 1075 (Colo. App. 1992).  A contract is formed "when one party makes an offer and the other accepts it, and the agreement is supported by consideration."  *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009).

¶ 19    The party seeking to enforce a contract bears the burden of proving its existence.  *Tuscany Custom Homes, LLC v. Westover*, 2020 COA 178, ¶ 52.  To satisfy the burden, the party must show by a preponderance of the evidence that the parties agreed to all material terms and that the terms are sufficiently definite.  *Id.*

¶ 20    When one party to a contract materially breaches the contract, the other party is excused from its obligations.  *Gravina Siding & Windows Co. v. Gravina*, 2022 COA 50, ¶ 12.  A material breach is one that "'goes to the root of the matter or essence of the contract' and renders substantial performance under the contract impossible."  *Interbank Invs., L.L.C. v. Vail Valley Consol. Water*

7

*Dist.*, 12 P.3d 1224, 1229 (Colo. App. 2000) (citations omitted). Moreover, a party who anticipatorily breaches or repudiates a contract cannot later enforce it. *Technics, LLC v. Acoustic Mktg. Rsch. Inc.*, 179 P.3d 123, 126 (Colo. App. 2007), *aff'd*, 198 P.3d 96 (Colo. 2008). Anticipatory repudiation occurs when a party "manifests a definite and unequivocal intent" not to perform as the contract requires. *Id.*

¶ 21    When an enforceable settlement agreement exists, a court may enforce the agreement and dismiss the case. *See Yaekle v. Andrews*, 195 P.3d 1101, 1111 (Colo. 2008). Whether a contract exists, whether it was breached, and whether a breach was material are all questions of fact that we review for clear error. *Id.*; *Ute Water Conservancy Dist. v. Fontanari*, 2022 COA 125M, ¶ 35; *Coors v. Sec. Life of Denv. Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005). We therefore are bound by the district court's factual findings on these issues so long as they have record support. *Yaekle*, 195 P.3d at 1111. The interpretation of a contract is a legal issue that we review de novo. *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9.

¶ 22  The parties agree on appeal that the release that Holder signed on January 5 and sent to FLI on January 6 was an enforceable settlement agreement.  But we agree with Holder that the district court did not clearly err by finding that FLI materially breached that agreement by refusing to pay Holder $25,000 and conditioning its payment of any settlement funds on resolution of the lien issue.

¶ 23  The release unambiguously required FLI to pay $25,000 to Holder.  The district court found, with record support, that FLI did not do so.  Instead, FLI refused to make any payment until Holder had taken care of the lien — either through a lien agreement or a lien release — and, at best, only *ever* agreed to pay Holder $25,000 *minus the amount of the lien.*  As the district court concluded, the release included no such condition to payment.[2]  Thus, because payment of $25,000 to Holder was the essence of the contract —

---

[2] Cisneros Mosqueda contends that the district court erred by concluding that FLI would not have been liable for the lien if it had paid Holder the full settlement amount.  *See Strunk v. Goldberg,* 258 P.3d 334, 338 (Colo. App. 2011).  But as Cisneros Mosqueda acknowledges in his reply brief, that point is immaterial because, even if true, it would not change the terms of the agreement between FLI and Holder.  FLI does not argue that its potential liability to a third party excused its performance of that agreement.

9

indeed, the *only* benefit Holder was owed — FLI's failure to make that payment was a material breach that released Holder from his obligation not to sue. *See Gravina Siding & Windows*, ¶¶ 12-13.

¶ 24     Cisneros Mosqueda characterizes FLI's communication about the lien as nothing more than an "inquiry" or an "offer to modify" the release, which he argues was not a breach. But the record supports the district court's finding that FLI did more than inquire. In particular, FLI's own claim notes indicate that FLI twice told Holder's attorney that it would need a lien agreement or a lien release before it would issue payment. FLI's claims adjuster similarly testified at the evidentiary hearing that he told Holder's attorney he "need[ed] [the lien] addressed before [he could] process the funds." This evidence supports the district court's finding that FLI "demanded" — not suggested — "a separate lien release or agreement before releasing the funds." Because the parties' agreement did not allow FLI to withhold funds on that basis, such a demand was less an "inquiry" than an expression of "unequivocal intent that [FLI] [would] not perform as required by the contract." *Technics*, 179 P.3d at 126; *cf. Scott v. Crown*, 765 P.2d 1043, 1047

(Colo. App. 1988) (holding that a demand for "performance beyond that required by the contract[]" was an anticipatory repudiation).

¶ 25    But we need not decide whether FLI anticipatorily repudiated the contract (and neither did the district court) because, as the district court found, FLI never paid $25,000 to Holder. Certainly, it did not do so in the weeks after Holder signed the release, despite knowing he was "in desperate need" of the payment. *See Gravina Siding & Windows*, ¶ 20 ("[I]f a contract contains no explicit provision concerning the time for a party's performance of obligations, the party must perform within a 'reasonable time' as determined by the circumstances of the case." (citation omitted)). And when FLI eventually did send a check to Holder, it was for just $23,254.93. The district court correctly found that FLI's failure to pay Holder $25,000, as the release required, was a material breach that excused Holder from his obligations under that release.

C.    Lien Communication Between FLI and King

¶ 26    Cisneros Mosqueda next contends that the parties reached a second settlement agreement when King agreed FLI could pay the lien out of the settlement. He points to the claims adjuster's testimony and notes indicating that King agreed to "get [the lien]

11

resolved" and told FLI how to "divide the checks."  We agree with Holder that Cisneros Mosqueda did not preserve this argument.

¶ 27    In Cisneros Mosqueda's motion to enforce the settlement, he argued that the parties' settlement agreement was the written release and, alternatively, that FLI accepted the counteroffer in Hemmat's January 27 letter.  Although he asserted at the hearing that FLI and King "agreed to send a final lien amount . . . and a release from that lien so that the lien could be paid out of the settlement proceeds," he never suggested that this discussion gave rise to a separate agreement.  Instead, though he did not explicitly address the legal significance of the exchange, his argument implied that it was part of FLI's performance of the original agreement.

¶ 28    Cisneros Mosqueda's failure to argue in the district court that the communications between King and FLI formed a "second settlement agreement" matters here.  Although a party need not use "talismanic language" to preserve an argument for appeal, the party must give the district court "an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it."  *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004).  Cisneros Mosqueda's passing reference to King's agreement to

12

resolve the lien did not afford the district court that opportunity. Without any argument that a second agreement was formed, the district court had no reason to make factual findings as to the existence of such an agreement.[3] Nor did it have any reason to address the legal arguments the parties make on appeal regarding whether that purported agreement had adequate consideration.

¶ 29 Moreover, the record on this issue is scant — likely because Cisneros Mosqueda did not frame it in this manner in the district court. The entirety of the evidence Cisneros Mosqueda cites on this point is that (1) King "told [the claims adjuster] how much to pay and divide the checks up"; (2) King "agreed to get [the lien] resolved" and (3) the claims adjuster "informed [King] [FLI] would need a lien agreement or a lien release in order to finalize payment" and "King "agreed and said [he] would get back to [him]."[4] Given the limited

---

[3] Cisneros Mosqueda cites the district court's statement that the claims adjuster "acknowledged that [Bendinelli] agreed to pay the . . . lien from settlement proceeds." But the court was summarizing the claims adjuster's testimony, not making a factual finding, much less a finding that an enforceable agreement was formed.

[4] Notably, "divid[ing] the checks up" — i.e., FLI paying the lien — and "get[ting] the lien resolved" — i.e., Holder discharging the lien — appear to be two *different* options for addressing the lien.

focus on this issue at the hearing, we cannot fault the district court for failing to sua sponte consider whether a second agreement was formed. And without a factual finding, we have nothing to review.

¶ 30 Thus, we conclude that Cisneros Mosqueda failed to preserve his argument that the communications between King and FLI gave rise to a second enforceable agreement. We therefore decline to further address the issue. *See Gestner v. Gestner*, 2024 COA 55, ¶ 18 ("In civil cases, issues not raised in or decided by the district court generally will not be addressed for the first time on appeal.").

### D. January 27 Letter

¶ 31 Cisneros Mosqueda's final theory is that Hemmat's January 27 letter was a new settlement offer that FLI accepted by sending payment and providing written notice to Bendinelli. Alternatively, he argues that the letter was an offer for a unilateral contract that FLI accepted by its substantial performance. We disagree.

¶ 32 If an offeror "prescribes a particular time, place, or other condition of acceptance, then the offer can be accepted only in the manner prescribed." *Extreme Constr. Co. v. RCG Glenwood, LLC*, 2012 COA 220, ¶ 44. When, as in this case, the offeror requests "a return performance rather than a promise to perform," the offer is

one for a unilateral contract. *Scoular Co. v. Denney*, 151 P.3d 615, 619 (Colo. App. 2006). Such an offer is accepted "when substantial performance has been rendered by the offeree." *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 399 (Colo. 1987).

¶ 33   There is no dispute that FLI did not accept the January 27 offer "in the manner prescribed" by Hemmat. *Extreme Constr.*, ¶ 44. The letter stated that FLI could accept the new offer only by tendering payment to Holder and Bendinelli and providing written confirmation to Hemmat on or before February 3 that the check had been tendered. Setting aside the lack of clarity in the record as to when the payment was made, FLI did not present evidence at the hearing that it notified anyone — much less Hemmat — before the February 3 deadline that the checks had been tendered.

¶ 34   Citing general agency law, Cisneros Mosqueda asserts that FLI's notice *to Bendinelli* was enough. *See Strong Bros. Enters., Inc. v. Est. of Strong*, 666 P.2d 1109, 1112 (Colo. App. 1983) ("[N]otice to an agent is constructive notice to the principal."). But we need not decide this point because Cisneros Mosqueda failed to present any evidence that FLI provided timely notice to Bendinelli either.

¶ 35    As the party seeking to enforce the settlement agreement, Cisneros Mosqueda bore the burden of proving its existence. *Tuscany Custom Homes*, ¶ 52.  But the only evidence that he presented on that point was a letter — dated February 3 and erroneously addressed to Texas — that the claims adjuster testified had been "sent."  The claims adjuster did not explain *how* the letter was sent, and Cisneros Mosqueda did not otherwise present evidence demonstrating that the letter was *received,* or even delivered, on February 3 (or ever).  And while Cisneros Mosqueda refers to this letter in his opening brief as a "fax," he does not cite anything in the record indicating that the letter was in fact faxed.

¶ 36    Whether or not it was material who the notice was sent to, Hemmat's January 27 letter made clear that notice by February 3 *was* material.  That letter explained that Holder was preparing to sue Cisneros Mosqueda and would do so "without any further warning" if he did not have "assurance that the check ha[d] been tendered" by February 3.  In other words, simply placing the check in the mail was not enough.  Holder needed timely notice that FLI had done so; that was the only way to forestall suit.  Because Cisneros Mosqueda failed to present any evidence that Holder

16

actually received such notice — through *anyone* — he failed to meet his burden of proving that he accepted the January 27 offer. *See Suss Pontiac-GMC, Inc. v. Boddicker*, 208 P.3d 269, 271 (Colo. App. 2008) ("[C]ourts generally disallow alternative delivery methods that fail to resolve questions about timeliness and actual receipt.").

¶ 37    We also reject Cisneros Mosqueda's argument that FLI accepted the January 27 offer by substantial performance, despite failing to comply with its express terms of acceptance.  Initially, it is not clear when the payment was sent, and the record appears to indicate that it was not received until February 10 — a week after Hemmat's deadline for "tender[ing]" payment.  *See Werne v. Brown,* 955 P.2d 1053, 1055 (Colo. App. 1998) ("Generally, payment by mail is not effective until receipt . . . .").  Although the check was dated February 3, Holder's wife attested that an FLI representative told her on February 8 that it had not yet been sent.  And whenever the check was sent, it was mailed to an erroneous address.  *See id.* ("If payment by mail is directed or authorized . . . , the time of delivery is the time that the payment, *properly addressed* with postage prepaid, is put in the mail."  (emphasis added)).  Given the

17

offer's emphasis on timing, simply placing a check in the mail to somewhere at some point would not be substantial performance.

¶ 38 But even if FLI mailed the check to Holder (via Bendinelli) on February 3, that alone would not be substantial performance if FLI did not provide timely notice that it had done so. For the reasons above, the circumstances establish that timely notice was a material term of the offer — particularly if the check was simply going to be placed in the mail on the day the offer expired. In short, FLI could not accept Holder's offer not to file suit as of February 3 unless it notified Holder by that date that it was doing so.

¶ 39 Thus, because FLI did not accept the January 27 offer in the manner prescribed and did not prove that it otherwise gave notice by February 3 that it accepted the offer, the January 27 letter did not give rise to an enforceable settlement agreement.

### III. Disposition

¶ 40 The judgment is affirmed.

JUDGE GROVE and JUDGE YUN concur.